AMERICAN JEWISH CONGRESS, et al., Plaintiffs-Appellants,

v.

CITY OF CHICAGO, et al., Defendants-Appellees.

No. 86–3021.

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1987.

Decided Aug. 18, 1987.

As Amended Aug. 28, 1987.

---

Sylvia M. Neil, American Jewish Congress, Harold C. Hirshman, Sonnenschein Carlin Nath & Rosenthal, Chicago, for plaintiffs-appellants.

Ruth M. Moscovitch, Chief Asst., Corp. Counsel, Chicago, for defendants-appellees.

Before WOOD, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Every winter holiday season for the past thirty years, a crèche has been displayed in the lobby of the Chicago City-County Building. In November, 1985, the American Jewish Congress filed this suit against the City of Chicago and others (collectively referred to as "the city"), contending that the display of the crèche violated the Establishment Clause of the First Amendment. The district court held that the case was controlled by *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). In *Lynch*, the Supreme Court held that a city-owned holiday display that included a crèche, and that was located in a privately-owned park, was constitutional. The district court therefore granted summary judgment to the defendants. We find that

this case is distinguishable from *Lynch*, and we reverse the judgment of the district court.

## I.

## A.

The Daley Center Plaza and the City-County Building (better known as "City Hall") form a single unit, divided by Clark Street, but connected by a broad underground corridor. The two buildings house both city and county governmental offices. Each year, from shortly after Thanksgiving Day to New Year's Day, the entire complex is decorated for the winter holiday season. At issue in this case is a nativity scene which, with the city's permission, was on display from December 4, 1985 to January 4, 1986.

The nativity scene was placed at the intersection of the east-west and north-south lobbies of City Hall, slightly north of the center line of the east-west lobby. The scene consisted of several white plaster figures, each under twelve inches in height, representing the infant Jesus, the Virgin Mary, Joseph, the Three Wise Men, and various shepherds and animals. Behind the figures were tree branches strung with miniature holiday lights. The display was arranged on a three-foot-high platform measuring approximately nine feet wide by eight feet deep. At the rear of the platform, and rising from it to a height of ten feet from the lobby floor, was a fabric backdrop, at the top of which was a banner reading "On Earth Peace—Good Will Toward Men." No public funds were expended on the scene for repair, maintenance, rent, or heat. However, a nominal amount of public funds was expended on the electricity required to illuminate the scene. Although the appellants allege that city workers erected and dismantled the display, the city maintains that the workers did so on their own time and were not paid for their work.

In addition to the nativity scene, the City of Chicago erected a number of other displays and decorations in the City Hall lobby for the 1985–86 holiday season. These in-cluded: eight Christmas wreaths, each forty-two inches in diameter, hung on the lobby walls above the elevators that service the upper floors of the building; one decorated Christmas tree eighteen feet in height and fifteen feet in diameter, which stood near the LaSalle Street entrance; a mechanical Santa Claus, accompanied by two reindeer and a sleigh that served as a depository for donations to "Share-It", a city program designed to encourage citizens to donate food and supplies to needy persons; and other displays that formed part of the "Share-It" program, such as stacked cartons in the north side of the north-south lobby and a banner strung across and above the intersection of the east-west and north-south lobbies. These decorations and displays were placed from ten to ninety feet away from the nativity scene.

Still further away were other seasonal decorations and displays. For instance, the first-floor window-wells of City Hall contained small Christmas trees with lights; the potted trees along the curb on LaSalle Street were strung with lights; and a ninety-foot, decorated Christmas tree stood in the Daley Center Plaza. As part of the "Share-It" program, the city also erected a large "snowman" and a contribution box display in the plaza.

Finally, the entire complex served as a forum for public performances relating to the holiday season, such as local schoolchildren performing Christmas carols. In addition, recorded holiday music played continuously in the Daley Center Plaza.

## B.

The nativity scene at issue has a long and somewhat troubled history. The display was built over thirty years ago by the Chicago Plasterer's Institute, a private entity, and donated to the City of Chicago. In 1978, the American Civil Liberties Union and others sued the city, charging that the display violated the Establishment Clause of the First Amendment. That lawsuit ended in a consent order in 1979. *See DeSpain v. City of Chicago*, No. 78 C 4997 (N.D.Ill. Dec. 6, 1979). Under the consent

order, the city was permitted to continue to display the crèche in the City Hall lobby, provided that the city expend no public funds for the display, and that it affix written disclaimer-of-endorsement signs to the display. Consequently, the city attached six rectangular disclaimer signs to the nativity scene, two affixed to the front of the display platform, and two located on each side of the display. Each sign measured approximately seven and one-half inches by ten inches, and read: "Donated by the Chicago Plasterer's Institute—this exhibit is neither sponsored nor endorsed by the Government of the City of Chicago." As a result of the *DeSpain* litigation, the city alleges that it also transferred title in the display back to the Plasterer's Institute.

In 1984, William Ware, the mayor's chief of staff, ordered that the display be dismantled. However, this decision caused intense public outcry, and Mayor Washington eventually ordered the nativity scene reerected.

The events related to this litigation began in October, 1985, when Sylvia Neil, the Midwest Legal Director of the American Jewish Congress ("AJC"), wrote a letter to Ernest Barefield, the mayor's chief of staff, requesting on behalf of her organization that the city not allow the display of the crèche in City Hall during the 1985–86 holiday season. Barefield responded that the nativity scene would continue to be displayed, because: (1) it had been a traditional part of the city's holiday festivities for many years; (2) the Supreme Court had made clear in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) and in *Board of Trustees v. McCreary*, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985) that such displays were not unconstitutional; and (3) public sentiment favored such holiday displays.

The AJC subsequently sued the city for injunctive and declaratory relief, and for damages and costs, arguing that the display violated the Establishment Clause of the First Amendment. After discovery, the district court granted the defendants'

motion for summary judgment, and the AJC appealed. We reverse.

## II.

The AJC first argues that the district court improperly granted summary judgment to the defendants in this case because there are disputed material issues of fact. We reject this argument.

■ The AJC points out that the parties differ as to whether the nativity scene should be viewed as self-contained or as part of a larger holiday display; whether the crèche depicts a historical event or is a religious symbol; whether the crèche has symbolic meaning; and whether the crèche communicates a "message of government endorsement," *see Lynch*, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring). But, as the district court correctly noted, these disputes involve conclusions of law rather than facts. The AJC also points to disputes between the parties as to the City's alleged preferential treatment of the crèche over other displays in the City Hall lobby, the political divisiveness engendered by the display, and the true ownership of the crèche. Although these disputes involve issues of fact, none raises a material issue that would require a remand for trial. We therefore proceed to the merits of the case.

## III.

### A.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const.Amend. I. It has often been contended that the drafters of the amendment had only two narrow purposes in mind: to prevent the establishment of a national church, and to forbid a national preference of one Christian sect over another. Thus, a commentator wrote in 1851 that "the real object of the amendment was, not to countenance, much less to advance, Mahometanism, or Judaism, or infidelity, by prostrating christianity; but to exclude all rivalry among christian sects, and to prevent any national

ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government." 2 J. Story, Commentaries on the Constitution of the United States § 1877, at 594 (1851) (*quoted in Wallace v. Jaffree*, 472 U.S. 38, 52 n. 36, 105 S.Ct. 2479, 2488 n. 36, 86 L.Ed.2d 29 (1985)); *see also Wallace*, 472 U.S. at 106, 105 S.Ct. at 2516 (Rehnquist, J., dissenting) (The Establishment Clause "forbade establishment of a national religion, and forbade preference among religious sects or denominations."); *ACLU v. City of St. Charles*, 794 F.2d 265, 269 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986) (The original purpose of the Establishment Clause was "to prevent the national government from setting up an established church.").

Over time, however, the courts have come to recognize that the Religion Clauses of the First Amendment signify a broader set of principles. One of these is the principle that government—at all levels—should stay out of religious affairs. This principle has been memorialized in Thomas Jefferson's famous metaphor of a "wall of separation" between church and state. *See Everson v. Board of Education*, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947); 8 Writings of Thomas Jefferson 113 (H. Washington ed. 1861).

The Religion Clauses have also come to stand for the principle of government neutrality, meaning not only that government should not favor one religion over another, but also that government should not favor religion over nonreligion. *See Epperson v. Arkansas*, 393 U.S. 97, 103–04, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968); *Abington School Dist. v. Schempp*, 374 U.S. 203, 226, 83 S.Ct. 1560, 1573–74, 10 L.Ed.2d 844 (1963); *see also St. Charles*, 794 F.2d at 270 (The Supreme Court "has treated the establishment clause as a directive to the courts to strike down all public acts ... whose primary purpose or predominant effect is to promote one religious group at the expense of others or even promote reli-

gion as a whole at the expense of the nonreligious.").

Finally, and most importantly, the Religion Clauses have come to symbolize the principle of liberty and the individual's right to conscience. *See Wallace v. Jaffree*, 472 U.S. 38, 50, 105 S.Ct. 2479, 2486–87, 86 L.Ed.2d 29 (1985) ("[T]he Court has identified the individual's freedom of conscience as the central liberty that unifies the various clauses in the First Amendment."); *ACLU v. City of Birmingham*, 791 F.2d 1561, 1563 (6th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986) ("Every person must be free to make decisions in religious matters without any compulsion or interference by government."); J. Madison, *Memorial and Remonstrance Against Religious Assessments*, 1795, in The Complete Madison 299 (S. Padover ed. 1953) ("The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate.").

Because of these broad, often conflicting visions behind the Religion Clauses, the Establishment Clause erects a " 'blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.' " *Lynch*, 465 U.S. at 679, 104 S.Ct. at 1362 (*quoting Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971)). However, the Supreme Court has provided some guidance. In *Lemon v. Kurtzman*, the Supreme Court adopted a three-part test for analyzing Establishment Clause cases. "First, the legislature must have adopted the law with a secular purpose. Second, the statute's principal or primary effect must be one that neither advances nor inhibits religion. Third, the statute must not result in an excessive entanglement of government with religion." *Edwards v. Aguillard,* — U.S. —, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987); *see Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111.[1] The

---

1. Although the *Lemon* test has come under severe criticism by individual members of the Court, *see, e.g., Corporation of the Presiding Bishop v. Amos,* — U.S. —, 107 S.Ct. 2862,

2873–74, 97 L.Ed.2d 273 (1987) (O'Connor, J., concurring); *Wallace v. Jaffree*, 472 U.S. 38, 112, 105 S.Ct. 2479, 2519–20, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting), and appeared

district court did not analyze this case under the *Lemon* test, because in its view Lynch was clearly controlling. We find that *Lynch* is distinguishable, and that the display of the nativity scene violated the second prong of *Lemon*.

## B.

In *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Supreme court considered the constitutionality of a nativity scene that had formed part of an annual Christmas display owned and erected by the city of Pawtucket, Rhode Island. The display was situated "in a park owned by a nonprofit organization and located in the heart of the shopping district," *Lynch*, 465 U.S. at 671, 104 S.Ct. at 1358. In addition to the nativity scene, the display included, among other things, "a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, [and] a large banner that read[ ] 'SEASONS GREETINGS,'" *id.* The district court concluded that the inclusion of a nativity scene in this display violated all three prongs of *Lemon*, and the court of appeals affirmed. The Supreme Court reversed.

The Court began its analysis by noting that in each Establishment Clause case, "the inquiry calls for line-drawing; no fixed, *per se* rule can be framed." *Lynch*, 465 U.S. at 678, 104 S.Ct. at 1362. The Court then held that, in the case before it, the district court had "plainly erred by focusing almost exclusively on the crèche," *id.* at 680, 104 S.Ct. at 1363. The relevant inquiry, according to the Court, was not whether a nativity scene, considered in the abstract, is a religious symbol, but whether the particular display at issue, considered in its overall context, could be said to advance religion. In the Court's judgment, given the overwhelmingly secular charac-

ter of the Pawtucket display as a whole, "the inclusion of a single symbol of a particular historic religious event ... [did not] so 'taint' the city's exhibit as to render it violative of the Establishment Clause," *id.* at 686, 104 S.Ct. at 1366.

The district court in this case erred when it concluded that the City Hall nativity scene "matche[d] squarely the Christmas context contemplated by the Supreme Court in *Lynch*," *American Jewish Congress v. Chicago*, No. 85 C 9471, at 16 (N.D.Ill. Nov. 5, 1986). The Court in *Lynch* found it highly significant that the crèche in that case was only one element in a larger display that consisted in large part of secularized symbols and decorations. "These features combine[d] to make the government's display of the crèche in this particular physical setting no more an endorsement of religion than such governmental 'acknowledgements' of religion as legislative prayers," *Lynch*, 465 U.S. at 692–93, 104 S.Ct. at 1369 (O'Connor, J., concurring). This case is different. Despite the City of Chicago's contention that the entire City Hall-Daley Center Plaza complex constitutes a single display for purposes of the *Lemon* test, the evidence supports the conclusion that the nativity scene was self-contained, rather than one element of a larger display. For instance, the closest decoration to the nativity scene—the "Share-It" banner ten feet away, suspended above the intersection of the lobbies in City Hall—was thematically related to the other elements of the "Share-It" display (the Santa Claus, reindeer, and sleigh full of donated canned goods), but not to the nativity scene. Similarly, the wreaths on the wall above the elevators, although perhaps visible to an observer standing near the crèche, cannot reasonably be said to have been part of the same "display." Finally, the wording of the disclaimer signs affixed to the platform of the display called attention to the nativity

on the brink of being abandoned entirely in *Lynch, see* 465 U.S. at 679, 104 S.Ct. at 1362 ("[W]e have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area."), the Court has

nevertheless applied the test in all its Establishment Clause cases since *Lemon* except for *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).

scene as a distinct entity. In this case, therefore, unlike *Lynch*, the secularized decorations in the vicinity of the nativity scene were not clearly part of the same display.

We need not, however, settle the debate over how far a nativity scene must stand from a Christmas tree or Santa Claus to be considered part of the same display, and hence "neutralized" by secular symbols of holiday cheer. In this case, another aspect of the nativity scene's physical setting plainly distinguishes it from *Lynch:* its placement in City Hall.

The Establishment Clause is concerned with the messages the government may send to its citizenry about the significance of religion. *See Lynch*, 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). The crèche in *Lynch*, although sponsored by the City of Pawtucket, was located in a privately-owned park, a setting devoid of the government's presence. But the display in this case was located within a government building—a setting where the presence of government is pervasive and inescapable. The Court's holding in *Lynch* that the inclusion of a crèche in a holiday display located in a private park did not violate the Establishment Clause cannot control this case, where the display was placed inside the "official headquarters building of the municipal government," *ACLU v. City of Birmingham*, 791 F.2d 1561, 1566 (6th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986) (display of isolated nativity scene on the lawn of City Hall violated the Establishment Clause). Because the Supreme Court's decision in *Lynch* does not control

this case, we must analyze the display at issue under *Lemon*.[2]

### C.

The first requirement of *Lemon* is that the government action serve a secular purpose. However, this requirement does not mean that the government's purpose must be unrelated to religion—"that would amount to a requirement 'that the government show a callous indifference to religious groups,'" *Corporation of the Presiding Bishop v. Amos*, —— U.S. ——, ——, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987) (*quoting Zorach v. Clauson*, 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952)). Rather, the purpose requirement "aims at preventing the relevant governmental decision maker ... from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters," *id.* —— U.S. at ——, 107 S.Ct. at 2868. The City of Chicago has not abandoned neutrality in this case.

The AJC, in arguing that the purpose of the City Hall nativity scene was to promote Christianity, points out that in October, 1959, Mayor Daley said of the scene, "We are a Christian Nation. I think the more religion we can get in politics, the better off we are." This comment, although perhaps relevant to the original purpose of the nativity scene, reveals little about the purpose behind the 1985–86 display. More pertinent is the affidavit of Ernest Barefield, Mayor Washington's chief of staff at the time this litigation began. Barefield's affidavit reveals several purposes behind Chicago's display: (1) recognition of a city tradition of "taking official note of Christ-

---

**2.** Nor does the decision in *McCreary v. Stone*, 739 F.2d 716 (2d Cir.1984), *aff'd without opinion by an equally divided Court*, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985), aid our analysis. In *McCreary*, the Village of Scarsdale, New York, refused a civic group's request to place a crèche in a city-owned park in the center of the business district during the winter holiday season. In previous years, when the crèche was displayed, it stood alone, but the display contained a small disclaimer sign that read, "This crèche has been erected and maintained solely by the Scarsdale Crèche Committee, a private organization." *Id.* at 728. The Second Circuit held that this display did not violate the Estab-

lishment Clause, but remanded the case with the instruction that the district court enter an order providing for a larger, more visible disclaimer sign. *Id.* The Supreme Court's summary affirmance, without opinion, gives us no guidance. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 73 n. 8, 97 S.Ct. 2264, 2271 n. 8, 53 L.Ed.2d 113 (1977) ("Judgment entered by an equally divided Court is not 'entitled to precedential weight.'"); *United States v. Pink*, 315 U.S. 203, 216, 62 S.Ct. 552, 558, 86 L.Ed. 796 (1942) (same). Moreover, *McCreary* is factually distinguishable from this case. As in *Lynch*, the nativity scene in *McCreary* stood in a park, not in a government building.

mas"; (2) recognition of public sentiment in favor of the nativity scene; and (3) attraction of visitors to the downtown business district. None of these stated purposes is impermissible.

The city's intention to "take official note of Christmas" by permitting the nativity scene to be displayed in City Hall is not an illegitimate purpose under *Lemon.* "Celebration of public holidays, which have cultural significance even if they also have religious aspects, is a legitimate secular purpose." *Lynch,* 465 U.S. at 691, 104 S.Ct. at 1369 (O'Connor, J., concurring). Christmas is clearly a public holiday, as well as a day of religious significance to Christians, and the Establishment Clause does not preclude the City of Chicago from acting with the intent to take "official note" of the day.

■■■ The city's recognition of public sentiment in favor of the nativity scene was similarly permissible. The AJC points out that in 1984 the Chicago City Council, in voting to affirm the display of the nativity scene, stated that the crèche "symbolized the 'true meaning of Christmas' for hundreds of thousands of Christian Chicagoans." But this recognition and accommodation of religious sentiments is not the same as intending to promote a particular point of view in religious matters. The Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n,* —— U.S. ——, 107 S.Ct. 1046, 1051, 94 L.Ed.2d 190 (footnote omitted). In the absence of any evidence that the city's stated purposes behind the display of the nativity scene are merely a sham, *see Edwards,* 107 S.Ct. at 2579, we must conclude that the 1985–86 display had no invidious purpose.

The second inquiry under *Lemon* is whether the government action had the effect of advancing or inhibiting religion. "[T]he mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred." *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 125–26, 103 S.Ct. 505, 511, 74 L.Ed.2d 297 (1982). An important concern of the effects test is thus "whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226–27, 87 L.Ed.2d 267 (1985). "Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *Lynch,* 465 U.S. at 694, 104 S.Ct. at 1370 (O'Connor, J., concurring). In *Lynch,* the Court found that the Pawtucket display, considered in its context, communicated no message of government endorsement, but " 'merely happen[ed] to coincide or harmonize with the tenets of some … religions,' " *id.* at 682, 104 S.Ct. at 1364 (*quoting McGowan v. Maryland,* 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961)). This case, however, is different.

■■■ We begin with the recognition that "[t]he Nativity scene, with its figures of Mary, Joseph, the infant Jesus, the Magi, shepherds, angels, and animals, is an unequivocal Christian symbol, unlike the Christmas tree and the reindeer and the tinsel and Santa Claus," *City of St. Charles,* 794 F.2d at 271. "A vivid tableau of the birth of Jesus Christ, it brings Christianity back into Christmas, unlike the star and the wreath and the tree, which for most people are in the nature of lifeless metaphors," *id.* at 272. Thus, "none who sense the origins of the Christmas celebration would fail to be aware of its religious implications." *Lynch,* 465 U.S. at 685, 104 S.Ct. at 1365. *Lynch* makes clear, however, that our analysis cannot stop with the conclusion that nativity scenes have religious significance. "Even the traditional, purely secular displays extant at Christmas, with or without a crèche, would inevitably recall the religious nature of the holiday." *Id.* Rather, the critical inquiry is

whether, considered in its unique physical context, the nativity scene at issue in this case communicates a message of government endorsement. We conclude that it does.

The presence of the government in Chicago's City Hall is unavoidable. The building is devoted to government functions: for example, both city and county government offices are located there, and the City Council holds its meetings there. Because City Hall is so plainly under government ownership and control, every display and activity in the building is implicitly marked with the stamp of government approval. The presence of a nativity scene in the lobby, therefore, inevitably creates a clear and strong impression that the local government tacitly endorses Christianity.

The message of endorsement is equally powerful on the symbolic level. Like the nativity scene itself, City Hall is a symbol—a symbol of government power. The very phrase "City Hall" is commonly used as a metaphor for government. A crèche in City Hall thus brings together Church and State in a manner that unmistakably suggests their alliance. The display at issue in this case advanced religion by sending a message to the people of Chicago that the city approved of Christianity.[3]

The city has attempted to mitigate the impact of this message by posting six disclaimer signs on the display, two on each side, and two on the front. However, the message of government endorsement generated by this display was too pervasive to be mitigated by the presence of disclaimers. As the district court correctly noted, "a disclaimer of the obvious is of no significant effect," *American Jewish Congress v. Chicago*, No. 85 C 9471 at 14 (N.D.Ill. Nov. 5, 1986).

" 'Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines. If this identification conveys a message of government endorsement ... a core purpose of the Establishment Clause is violated.' " *Grand Rapids School Dist. v. Ball*, 473 U.S. 373, 389, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). The government-approved placement of the nativity scene in Chicago's City Hall unavoidably fostered the inappropriate identification of the City of Chicago with Christianity, and therefore violated the Establishment Clause.[4] The judgment of the district court is, therefore, REVERSED.

EASTERBROOK, Circuit Judge, dissenting.

We must decide whether Chicago violates the Establishment Clause of the first amendment, made applicable to the states by the fourteenth, by displaying a crèche in City Hall during the Christmas season. To do so we must apply *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). This decision, like others requiring multi-factor balances, gives judges of the inferior federal courts fits. The Court avoided creating a rule about the treatment of religious symbols and instead announced that judges should examine each symbol's

3. "Endorsement [of a religion] sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch*, 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring). Justice O'Connor's observation is supported in this case by the evidence in the record. For example, Sol Brandzel, a member of the AJC, stated in an affidavit that he is an immigrant from Poland, whose first memories are of World War I. He stated that when he views the nativity scene in City Hall, he is "reminded of the government association with crèches and crosses in Europe and that the state prefers Christianity." He fur-

ther stated that the message he perceives from the display is that "as a non-Christian I am an outsider in the political community who is merely tolerated," and that "[e]very time I see the crèche prominently displayed in City Hall, I feel personally diminished by its presence."

4. Because we conclude that the display at issue violated the second prong of *Lemon*, we need not go on to consider whether the display resulted in excessive entanglement of government with religion. *See Edwards*, 107 S.Ct. at 2578 (if statute enacted for the purpose of endorsing religion, no consideration of the remaining prongs of *Lemon* necessary).

context. But which items of the context matter? If different elements cut in different directions, what is to be done? It is discomfiting to think that our fundamental charter of government distinguishes between painted and white figures—a subject the parties have debated—and governs the interaction of elements of a display, thus requiring scrutiny more commonly associated with interior decorators than with the judiciary. When everything matters, when nothing is dispositive, when we must juggle incommensurable factors, a judge can do little but announce his gestalt.

My colleagues' opinion rises above the subjective and deals thoughtfully with the problems *Lynch* consigned us. The conclusion is reasoned, and it may well be right—to the extent any resolution under an unfocused balancing test can be "right" or "wrong". I share the majority's belief that government and religion should be separate; their mixture has been the source of oppression in many nations, and ours was founded in part by those fleeing the religious policies of other governments. James Madison, who bequeathed us the Establishment Clause and much of the rest of the Constitution, was a strict separationist.

Yet it is also established that the first amendment does not require government to disregard religious sentiment. For example, it may choose Sunday as a day of rest, even though that reinforces Christianity and forces members of other religions to choose between their livelihood and their beliefs. *McGowan v. Maryland,* 366 U.S. 420, 431–53, 81 S.Ct. 1101, 1108–19, 6 L.Ed.2d 393 (1961); *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). See also, e.g., *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983); *Zorach v. Clausen,* 343 U.S. 306, 313–14, 72 S.Ct. 679, 683–84, 96 L.Ed. 954 (1952). The Establishment Clause was supposed to prevent the federal government from taxing for the support of a church or requiring religious observance. See generally Leonard W. Levy, *The Establishment Clause: Religion and the First Amendment* (1986). The law was to be impartial among religions and between belief and nonbelief. Symbology is a different matter; the government often may persuade when it may not coerce. From the beginning of the Republic much of the federal government's symbology has been Christian—down to the dating of the Constitution itself, which concludes:

> [D]one in Convention by the Unanimous Consent of the States present the Seventeenth Day of September in the Year of our Lord one thousand seven hundred and Eighty seven and of the Independence of the United States of America the Twelfth. In witness whereof We have hereunto subscribed our Names.

Our case is about symbology—about the images of Christmas and the event that holiday celebrates. Christmas, no less than the date inscribed on the Constitution, marks the religion of most Americans. Unlike Sunday closing laws, indeed unlike the formal holiday, the display of the crèche does not require obedience. People may venerate, disdain, or curse the icons as they please, without reward for the first or reprisal for the last. To hold that Chicago may not use a symbol showing the religious origin and significance of a national holiday is to extend Jefferson's "wall of separation" metaphor beyond its proper scope.

## I

I agree with the court that this case should be resolved one way or the other by summary judgment. This is so not because the court must grapple with issues of legal characterization—that was equally true in *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), and *Mucha v. King,* 792 F.2d 602, 604–06 (7th Cir.1986), which in applying the "clearly erroneous" rule to questions of characterization show that courts must employ the usual factfinding processes—but because we are reviewing a decision of a different government. When factual issues determine the constitutionality of governmental action, a federal court may not hold a trial and use its own findings to upset the decisions of the political branches. *Vance v.*

*Bradley,* 440 U.S. 93, 110–12, 99 S.Ct. 939, 949–50, 59 L.Ed.2d 171 (1979).

Even on matters touching the first amendment, courts must accept plausible judgments by other governmental actors. *McGowan* itself is the source of one of the most deferential standards, 366 U.S. at 426, 81 S.Ct. at 1105, though formally on the equal protection component of the case. In its most recent term alone the Supreme Court held several times, in first amendment cases, that courts should accept plausible judgments made by the political branches and refrain from independent factfinding. E.g., *Turner v. Safley,* — U.S. ——, 107 S.Ct. 2254, 2264–65 n. *, 96 L.Ed.2d 64 (1987); *Munro v. Socialist Workers Party,* — U.S. ——, 107 S.Ct. 533, 537–38, 93 L.Ed.2d 499 (1986). So if this case turns on inferences about whether passers-by see the crèche as part of a larger display containing secular symbols, the City receives the benefit of the doubt.

The plaintiffs in this case wanted to present testimony such as some persons' beliefs that white figurines (suggesting alabaster) are more offensive to religious minorities than painted figurines. (The figures in *Lynch* were painted, though they were also life-sized, *Donnelly v. Lynch,* 525 F.Supp. 1150, 1156 (D.R.I.1981), while the figurines in Chicago are about a foot tall.) It would be appalling to conduct litigation under the Establishment Clause as if it were a trademark case, with experts testifying about whether one display is really like another, and witnesses testifying that they were offended—but would have been less so were the crèche five feet closer to the jumbo candy cane. The Supreme Court has treated the issues in Establishment Clause litigation as constitutional facts, on which findings in trial courts are neither necessary nor welcome. E.g., *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), in which the Justices drew factual conclusions of their own, departing from specific findings of the district judge. See also Kenneth F. Ripple, *Constitutional Litigation* § 7–3(E)(3) (1984).

Treating ultimate questions under the religion clauses as constitutional rather than adjudicatory facts reduces the variance in how the judicial system handles these contentious cases. Treatment will be more uniform, less influenced by the religious sensibilities of the judge assigned to the case by lot. This is especially important when the court must balance imponderables; if questions of fact predominated, it would be impossible to maintain uniformity of decision. Here, too, the essential conclusions are constitutional facts. And on these questions we should give substantial deference to the political branches. The question under *Lynch* is not whether, as an initial matter, the members of this panel see this crèche as part of an integrated secular display, but whether reasonable people could see it so.

## II

*Lynch* held that Pawtucket, R.I., could include a crèche in an ensemble of other symbols of Christmas. *Lynch* requires us to affirm the district court's judgment. The crèche in *Lynch* had life-sized, painted figures and was the most prominent part of the display in the city's principal park. See 525 F.Supp. at 1155–56. The Supreme Court thought it significant that the display included reindeer, a tree festooned with lights, and other symbols of Christmas—some religious, some secular, and some (a talking wishing well, for example) irrelevant. The display in Chicago has the same mixture. City Hall and its outdoor plaza contain two trees (18′ indoors and 90′ outdoors), a mechanical Santa Claus, reindeer and sleigh (the sleigh serving as the depository for donations to the "Share-It" program), many 42″ wreaths, and banners asking people to make contributions of food and supplies to the needy. The Santa, sleigh, wreaths, banners, and indoor tree are between 10 and 90 feet from the crèche. On the plaza the City erected the larger tree, a snowman, and more Share-It receptacles. Christmas carols, live or recorded, sound constantly. Chicago's display lacks a talking wishing well, but I doubt that one is constitutionally necessary.

Whether the secular element of the display nearest the crèche is five or twenty feet away is insignificant. In each the crèche is part of a larger ensemble, and anyone walking through the park (or building) will see both the religious and the secular elements. Of course someone standing near enough to the crèche in Chicago will see little else, but that was true in Pawtucket as well; this comes from the law of perspective rather than the law of the land. The important thing, the Court concluded in *Lynch*, is that the government's entire activity celebrate all aspects of the holiday and not just the religious aspect. Chicago has not made religious icons the sole feature of its Christmas display. And it has not made the mistake of choosing an Easter symbol as the overawing feature of a Christmas display. *ACLU v. City of St. Charles*, 794 F.2d 265 (7th Cir.1986).

The court distinguishes *Lynch* on the ground that Pawtucket's display was in a park, while Chicago's crèche is in City Hall. Its location in City Hall, according to my colleagues, conveys an unmistakable impression that the City is behind Christianity. This finesses the question whether one should look at the crèche alone or at the whole display. *Lynch* holds that the government's stance must be discerned from everything the government chooses to exhibit. *That* principle does not depend on whether the display is in a park or in City Hall. And if the context is conclusive, then this case is, as the district court held, just like *Lynch*. What the City has "endorsed" is Christmas and its collection of symbols—Santa Claus, reindeer, sleighs, generosity, carols, trees, lights, wreaths, and the birth of the figure from whom the holiday takes its name as well as its original significance. *Lynch* holds that a city may display the symbols of Christmas without thereby endorsing Christianity. That is all Chicago has done. *Lynch* has been lampooned for implying that the secular symbols drain the religious symbols of their significance, see William W. Van Alstyne, *Trends in the Supreme Court: Mr. Jefferson's Crumbling Wall—A Comment on* Lynch v. Donnelly, 1984 Duke L.J. 770,

but any doubts we may have about whether a crèche loses its religious significance when surrounded by folderol should not affect our disposition of this case.

My colleagues hold (op. at 126–127 that Chicago had a secular purpose for including the crèche in its display. That finding should be sufficient to dispose of the case. How is the display of the crèche in City Hall necessarily an endorsement of Christianity if the City had a secular purpose? City Hall is the center of government, no doubt—but it is also where the entire Christmas display was located. To emphasize the former over the latter is to break up the display in a way *Lynch* says should not be done.

Both Pawtucket and Chicago put their crèches wherever they put the rest of their display. The display in Pawtucket was in a centrally located park, facing the busiest commercial district, 300 feet from City Hall. 525 F.Supp. at 1154–56. The display doubtless got more attention there than it would have in Pawtucket's City Hall, for which it was too big anyway. Chicago has a much larger City Hall and so can fit the whole display within its plaza. Chicago could have put the display in Grant Park on the lakefront, but in December few people brave the winds along the lake. The City is entitled to have its display in a central location. And if Chicago is to have a crèche at all, under *Lynch* it *must* include the crèche with the rest of its display.

The court believes that a crèche in City Hall is forbidden because the City endorses everything on display in City Hall, in a way that Pawtucket did not endorse things displayed in the park. But the crèche in Pawtucket was officially sponsored. The City bought the crèche; the mayor himself settled on details of the display; the City inaugurated the display officially each year.

When the Hodgson Park display [in Pawtucket] is opened, ceremonies at the Park are held in conjunction with those in City Hall, 300 feet away. Santa arrives at the Park in a City fire truck. He and the Mayor throw a switch, illuminating the lights at the Park and City

Hall.... The sound system that broadcasts Christmas carols through the Park is the same one used at City Hall. 525 F.Supp. at 1156. Pawtucket endorsed its crèche at least as much as Chicago does—more so, because Pawtucket owned the crèche, paid for city workers' labor to erect and dismantle it yearly, and sponsored the whole display, while Chicago's crèche sports disclaimers. The district court concluded in *Lynch:* "[t]he City's suggestion that ... people did not associate the Hodgson Park display with the City borders on the frivolous.... [T]he opening ceremonies at the Park are conducted by the Mayor.... The same music is broadcast at both places by a common sound system. Even though these factors may not reveal to onlookers the precise financial arrangements underlying the display, they surely indicate that the City had some significant part in its erection." 525 F.Supp. at 1176 (footnotes omitted).

Officials of Chicago will read with amusement the court's assertion that the City endorses whatever appears in City Hall. Do they all believe in Santa Claus, too? In 1979 the City invited John Sefick to display some of his art in the lobby of the Daley Center. One of the pieces Sefick put on display was a life-sized tableau of former Mayor Michael Bilandic and his wife accompanied by a tape recording satirizing Bilandic's response to the previous winter's record snowfall. The City tried to get rid of the art, or at least turn off the tape, and was met by an injunction. *Sefick v. City of Chicago,* 485 F.Supp. 644 (N.D. Ill.1979). Once the City opened the lobby to art, the court concluded, it could not dispose of one piece because it disliked the message. See also, e.g., *Southeastern*

*Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). City Hall is used for displays of many sorts. It is unlikely that passers-by believe that every feature of every display represents the official views of the City, any more than John Sefick's art did.

### III

Although Chicago's crèche is no more an endorsement of Christianity than Pawtucket's, I wonder whether it would matter had Chicago endorsed that family of religions explicitly. A statement of views about religion is not an "establishment" of religion. One can be persuaded (as I am) by Professor Levy that the Establishment Clause bars aid to all religions quite as much as it bars preferences among religions—and by Professor Kurland, *Religion and the Law* (1962), that the religion clauses together prevent the government from using force or funds to aid or inhibit the practice of religion [1]—yet believe that the government may participate as a speaker in moral debates, including religious ones. Speech is not coercive; the listener may do as he likes.

We must distinguish threats from shadows. Madison and Jefferson, the architects of our principles of religious liberty, understood this well. Madison as President proclaimed days of religious fasting and thanksgiving and later explained that he thought this permissible because the proclamations were "merely recommendatory" and because the Constitution is not concerned with trifles.[2] Jefferson, who refused on separationist grounds to issue thanksgiving proclamations,[3] nonetheless signed treaties sending ministers to the

---

**1.** Subject to the proviso that the government may and sometimes must accommodate religious beliefs, so long as the government does not distort religious choice. See *Corporation of Presiding Bishop v. Amos,* — U.S. —, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987); Michael W. McConnell, *Neutrality Under the Religion Clauses,* 81 Nw. U.L.Rev. 146 (1986).

**2.** See Levy, *The Establishment Clause* 100. In 1817, after leaving office, Madison confessed

that these proclamations violated the principles of separation for which he stood but pleaded "the legal aphorism de minimis non curat lex." Elizabeth Fleet (ed.), *Madison's "Detached Memoranda",* 3 William & Mary Quarterly 554, 559 (1946), reprinted in Philip B. Kurland & Ralph Lerner (eds.), 5 *The Founders' Constitution* 104 (1987).

**3.** See his letter to Rev. Samuel Miller, in 5 *The Founders' Constitution* 98–99.

Indians.[4] When the government expresses views in public debates, all are as free as they were before; that these views may offend some and persuade others is a political rather than a constitutional problem.

Some people believe that the religion clauses of the first amendment should be changed. Suppose Chicago's City Council passes this resolution: "The Anglican Church is the only true faith; those who spurn its teachings are damned; the Anglican Church should be established in the United States as it is in the United Kingdom." If the City Council then posts this in City Hall with its other resolves, sends copies to Members of Congress imploring them to amend the Constitution, and takes to the stump to drum up support for the amendment, has it done something forbidden? Does it violate the first amendment to call for revision of that amendment? Must those who would change the charter of the government proceed in secret—ensuring the absence of an informed debate and defeat of the initiative? The hypothetical resolution would be tolerable because part of a public debate, which it would not curtail.

State and federal governments have engaged in religious speech since the founding of the Republic. The First Congress established a chaplaincy, and to this day Congress opens with prayer. See *Marsh v. Chambers.* Congress provides the military and prisoners with chapels and chaplains. *Katcoff v. Marsh,* 755 F.2d 223 (2d Cir. 1985); cf. *Baz v. Walters,* 782 F.2d 701 (7th Cir.1986). President Washington (and all presidents since, other than Jefferson) proclaimed days of thanksgiving.[5] Thanksgiving and Christmas are national holidays. Congress regularly asks the President to issue religious proclamations. E.g., Pub.L. 97–280, 96 Stat. 1211 (1982), calling on the President to proclaim 1983 as the "Year of the Bible"—which he did, Proclamation 5018 of February 3, 1983, 3 C.F.R. 9 (1983 compilation). Congress has enacted permanent legislation calling for annual National Days of Prayer, 36 U.S.C. § 169h, and declaring that Memorial Day has a religious component, 36 U.S.C. § 169g. The nation's money proclaims "In God We Trust"; the Pledge of Allegiance and National Anthem refer to God; witnesses in our courts take oaths on the Bible; sessions of court open with the cry "God save the United States and this honorable Court." The newest national holiday celebrates the life of a Baptist minister, whose religious message is inseparable from his political message.

These religious acknowledgments and symbols share with Chicago's crèche the absence of coercion. The holder of a nickel need not trust in God, no matter what the coin says, and need not contribute the nickel (or even three pence) to a church. He may labor on Christmas if he likes—though Ebenezer Scrooge had to give Bob Cratchit that day off without governmental compulsion. He may "affirm" rather than "swear" when giving testimony and be silent while others say the Pledge of Allegiance. *Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). He need not study or even own a Bible during the "Year of the Bible". And he may turn his back on the crèche. The holidays, the chaplains, the proclamations, the slogans, the oath, the pledge, and the crèche alike give offense—to those of other faiths (or no faith) who feel slighted, to those of the same faith who believe that governmental involvement with religion diminishes both institutions, to those who see the camel's nose. The display of secular

---

**4.** The treaties are collected in Robert L. Cord, *Separation of Church and State: Historical Fact and Current Fiction* 261–70 (1982).

**5.** E.g., the Proclamation of October 3, 1789, which begins: "Whereas it is the duty of all nations to acknowledge the providence of Almighty God, to obey His will, to be grateful for His benefits, and humbly to implore His protection and favor" and then sets Thursday, November 26, 1789, as a day "to be devoted ... to the service of that great and glorious Being who is the beneficent author of all the good that was, that is, or that will be; that we may then all unite in rendering unto Him our sincere and humble thanks for His kind care", and much more in the same vein. 5 *The Founders' Constitution* 94. Washington issued this proclamation on the joint recommendation of both Houses of Congress, *ibid.,* which only days before (on September 25) had sent the text of the Establishment Clause to the states for ratification.

symbols to the exclusion of religious symbols for the same event offends other people. Either way, offense in the raw is not actionable. All speech may offend. There is no heckler's veto. Insult without injury is not even enough to create a case or controversy. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

Speech by the government is common. See Mark G. Yudof, *When Government Speaks: Politics, Law, and Government Expression in America* (1983). The drumbeat of politics, the innumerable flacks employed by federal agencies, the propaganda to stir up support for defense spending, the FTC's pamphlets on how to be a good consumer, the thousands of films distributed by the government here and abroad, these and more are financed from taxes. The government supports public television, finances presidential campaigns, see *Buckley v. Valeo*, 424 U.S. 1, 93–95, 96 S.Ct. 612, 670–71, 46 L.Ed.2d 659 (1976), gives tax breaks to favored lobbyists, see *Regan v. Taxation With Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), and to all churches, *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). You may loathe the presidential candidates and recoil from the tastes of the Corporation for Public Broadcasting, but to no avail. Some governmental speech will offend in itself; other speech will mobilize to action and so be more offensive still; yet none is forbidden. The absence of coercion is why. The government may encourage what it may not compel. E.g., *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). It may denounce what it may not forbid. *Block v. Meese*, 793 F.2d 1303, 1312–14 (D.C.Cir.1986) (Scalia, J.).

It is essential, of course, to ensure that governmental speech does not restrain. So in *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the Court held that drivers in New Hampshire may

blot out the slogan "Live Free or Die" (the state's motto) on their license plates. The government's right to have a motto does not imply a right to compel anyone to be a billboard. Yet the Court thought it sufficient to give each person control of his own speech; Mr. Maynard could not silence the message blaring from thousands of other license plates. There may be special problems when the audience is young, captive, or both. Sessions of a legislature may open with prayer, *Marsh* holds, but sessions of school may not. *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).[6] Children are summoned by law to school; even if told they need not pray, they will be subject to pressure to do so. Children's ridicule and ostracism of their peers for nonconformity may be more compelling than any fine the government could impose. So, too, *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), which involved the posting of the Ten Commandments in a classroom, dealt with a captive audience. When the audience can avert its eyes, walk away, or talk back, speakers have greater freedom. E.g., *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 72–74, 103 S.Ct. 2875, 2883–84, 77 L.Ed.2d 469 (1983); *Erznoznik v. Jacksonville*, 422 U.S. 205, 208–12, 95 S.Ct. 2268, 2272–74, 45 L.Ed.2d 125 (1975). This principle should apply to governmental as well as private speakers.

One can imagine governmental speech so pervasive that it impinges on freedom of thought even if the listener is not "captive". *Friedman v. Board of County Commissioners*, 781 F.2d 777 (10th Cir. 1985) (en banc), held unconstitutional a county seal with strong religious meanings. The seal appeared on all of the county's property and "pervades the daily lives of county residents." *Id.* at 782. "A person approached by officers leaving a patrol car emblazoned with this seal could reasonably assume that the officers were Christian police" (*ibid.*). The cross displayed in St.

---

**6.** See also *Stein v. Plainwell Community Schools*, 822 F.2d 1406 (6th Cir.1987), holding that high school commencements may open with prayer, provided the prayer is non-denominational. One judge of the panel would have allowed explicit references to Jesus in these prayers.

Charles was like that, too. It dominated the town. It could be seen from miles away; no one could live in or visit St. Charles without constantly being reminded that the City endorsed Christianity. The crèche in Chicago does not convey such an unavoidable message. Most residents of the City will live out their lives without seeing the crèche. The parties agree that even people with business at City Hall can maneuver their way around the building during the Christmas season without laying eyes on the crèche.

Perhaps speech about religion is fundamentally different from speech about communism ("live free or die"). But for a long time the Court has said that the religion clauses deal with governmental compulsion. For example, *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), paraphrases the Establishment Clause as "forestal[ling] compulsion by law of the acceptance of any creed or the practice of any form of worship". *Everson v. Board of Education*, 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–12, 91 L.Ed. 711 (1947), the source of modern Establishment Clause doctrine, speaks repeatedly of official compulsion as establishment. About a year ago the Supreme Court, unanimous on this point, proclaimed that the Free Exercise Clause "affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Bowen v. Roy*, 476 U.S. 693, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986).

This emphasis on compulsion as the central concern of the religion clauses has a solid footing. The establishments of Europe and the states were riddled with compulsion: compulsion to pay church taxes, compulsion to attend church, compulsion to accept the tenets of the chosen creed, test oaths, and disqualifications for office. Levy, *The Establishment Clause* 4–9. Some states established a single church; some states established all Protestant sects and allowed towns to choose; some states established no religion. But without taxes, test oaths, appointments of ministers, or other acts backed by threat of penalty, it is impossible to speak of "establishment". The use of governmental force and funds is exactly what people meant in 1789 by the word "establishment".

The works of Madison and Jefferson reveal the point. Jefferson wrote the principal draft of Virginia's Act for Establishing Religious Freedom and Madison the *Memorial and Remonstrance* of 1785, which jointly inform the meaning of the religion clauses. See Philip B. Kurland & Ralph Lerner (eds.), 5 *The Founders' Constitution* 77, 82–85 (1987). These are dominated by complaints about coercion. See generally Michael W. McConnell, *Coercion: The Lost Element of Establishment*, 27 Wm. & Mary L.Rev. 933 (1986).

Jefferson's bill of 1779 (modified slightly and enacted in 1785) objects to three principal elements of establishments: religious taxes, religious tests of office, and attempts to restrain the propagation of religious beliefs. The preamble declares, for example, that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors, is sinful and tyrannical". The bill does not protest government use of persuasion on matters religious; it is concerned with compulsion alone. The substantive rule it establishes is that

> no man shall be compelled to frequent or support any religous [sic] Worship place or Ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief, but that all men shall be free to profess, and by argument to maintain their opinion in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities.

The preamble to the bill is itself an exercise in religious persuasion. Jefferson begins:

> Well aware that the opinions and belief of men depend not on their own will, but follow involuntarily the evidence proposed to their minds, that Almighty God hath created the mind free, and manifested his Supreme will that free it shall

remain, by making it altogether insusceptible of restraint: That all attempts to influence it by temporal punishments or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness, and are a departure from the plan of the holy author of our religion, who being Lord both of body and mind, yet chose not to propagate it by coercions on either, as was in his Almighty power to do, but to extend it by, its influence on reason alone: ...

If all endorsement by the state of Christian beliefs is forbidden, then any state, that today enacted Jefferson's Bill for Establishing Religious Freedom would be violating the Establishment Clause!

The *Memorial and Remonstrance*, on which the Supreme Court has relied too many times to count, is an objection to a proposed tax for the support of Christian "teachers" in Virginia. Madison wrote that any support of religion "if finally armed with the sanctions of a law, will be a dangerous abuse of power" and expatiated on the evils of coerced support of the church. He held that religion "can be directed only by reason and conviction, not by force or violence" and that the state should not "force a citizen to contribute" so much as "three pence only of his property for the support of any one establishment". Madison added that "attempts to enforce by legal sanctions, acts obnoxious to so great a proportion of Citizens, tend to enervate the laws in general".

When introducing and debating the Establishment Clause on the floor of the House in 1789, Madison stated that

he apprehended the meaning of the words to be, that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience.

1 Annals of Congress 730 (J. Gales ed. 1834) (Aug. 15, 1789). Although the language was altered after that remark, none of the changes affects Madison's point: that the government should eschew the business of funding religion or penalizing adherence to any system of beliefs. Madi-

son did not suggest that the Establishment Clause put government out of the business of suasion; neither did anyone else in 1789. That is why the Congress that sent the Establishment Clause to the states thought it permissible simultaneously to call on President Washington to issue a religious proclamation of thanksgiving.

The contemporaneous evidence is all on one side. Subsequent deeds and words of Jefferson and Madison look in both directions, however. Jefferson declined to issue thanksgiving proclamations as President, though he signed treaties providing funds for religious activities. See page 23 above. Both Jefferson and Madison signed bills providing funds for chaplains. Madison issued thanksgiving proclamations but viewed them as regrettable. His "Detached Memoranda" of 1817 call the proclamations "shoots from the same root" as laws he would condemn (5 *The Founders' Constitution* 105). "Altho" recommendations only, they imply a religious agency, making no part of the trust delegated to political rulers." *Ibid.* Madison knew, however, that not every inroad on a principle is for that reason unconstitutional; he did not denounce his acts as unconstitutional by questioning their wisdom. Madison's own theory of constitutional interpretation was structural; he gave great weight to language, context, and the early implementation of the document. H. Jefferson Powell, *The Original Understanding of Original Intent*, 98 Harv.L.Rev. 885, 935–41 (1985). His approach to interpretation would have led him to conclude that Congress' recommendation to Washington, and the many thanksgiving proclamations of Presidents Washington and Adams, were dispositive on the strictly legal point.

Madison also vetoed, on constitutional grounds, a bill incorporating a church in the District of Columbia. 22 Annals of Congress 982 (Feb. 21, 1811) (veto message), reprinted in 5 *The Founders' Constitution* 99. To the modern mind this seems an assertion that any act nodding in the direction of a church is an establishment. That, however, is because today's corporate statutes are enabling laws; the corporation designs its own organization and rules of

conduct. The bill Madison vetoed, according to the veto message,

> enacts into, and establishes by law, sundry rules and proceedings relative purely to the organization and polity of the church incorporated, and comprehending even the election and removal of the Minister of the same; so that no change could be made therein by the particular society.... This particular church, therefore, would so far be a religious establishment by law; a legal force and sanction being given to certain articles in its constitution and administration.

As he had in the *Memorial and Remonstrance,* as he had on the floor of the House, Madison again expressed concern about governmental compulsion—about the interaction of *law* and religion, not simply of lawgivers and religion.

The genesis of the Establishment Clause persuades me that force or funds are essential ingredients of an "establishment". Yet I offer this conclusion in the spirit of constructive criticism, because it is plainly not the law today. *Engel v. Vitale,* 370 U.S. at 430, 82 S.Ct. at 1266–67, contains this passage:

> The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not.

The passage is circular: it says that there needn't be coercion, there need only be "establishment". If establishment *means* force or funds, then you can't have one without the other. The passage also is ukase. It is unreasoned, unsupported by history, and irrelevant to the case at hand. The very next passage states: "This is not to say, of course, that [school prayers] do not involve coercion". *Id.* at 430–31, 82 S.Ct. at 1267. And in this the Court is correct, for the pressure on children to conform, and the shame of ostracism, may be more powerful than the threat of imprisonment. Nonetheless, the dismissal of coercion in *Engel* has been the basis of

subsequent decisions including *Lynch,* in which the Court thought it essential to inquire whether the context made the whole display secular. When dicta become the ratio decidendi of later cases, judges of inferior federal courts are not free to proceed as if nothing had happened.

A judge's obligation to apply the dicta of *Engel* and the rationale of *Lynch* does not mean that he must endorse as well as acquiesce. A judge may, and I do, suggest that the prevailing doctrine could bear reexamination. While declaring that coercion is not part of an establishment of religion, the Court also continues to say that the interpretation of the Establishment Clause is informed by the original meaning of the text. No other part of our jurisprudence under the Bill of Rights contains such extensive discussions of, and reliance on, the background of the text. In some cases, such as *Marsh* (upholding legislative chaplains), the Court has held late 18th Century practices dispositive. In the great majority of cases the Court has assumed that "the line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers." *Abington School District v. Schempp,* 374 U.S. 203, 294, 83 S.Ct. 1560, 1609, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring). That line is one demarcating force (forbidden) from suasion (tolerable, even if unwelcome). It may be hard to draw, as *Engel* and the cases concerning seals and crosses (*supra* at 134–35) show. I have not tried to resolve the many hard cases that could arise under this approach. But difficulty in applying the original constitutional rule is not a good reason for expanding the scope of the constitutional prohibition.

## IV

The disappearance of coercion from the Establishment Clause in 1962 is an example of a tendency in constitutional reasoning to make the rule more abstract and then take the abstraction to the limit of its logic. The first step is identifying the purposes or consequences of the text—a step necessary in any approach to constitutional decision-

making. The interpreter concludes (accurately) that the Establishment Clause was designed to prevent the government's financing of religion or compulsion to affirm religious beliefs. That is about as far as the history goes on objectives. But we can identify the direction of the movement and some of the consequences.

> [T]he intended direction of the first amendment was the enhancement of religious freedom.... The objectives were to establish an equality among persons, so that each individual could choose without interference how to commune with his god, and to avoid the havoc that religious conflicts had imposed on mankind throughout history. I doubt, however, that we can learn more from the history of the origins of the religion clauses than the lesson Mr. Justice Jackson derived from the first amendment as a whole when he stated: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

Philip B. Kurland, *The Origins of the Religion Clauses of the Constitution,* 27 Wm. & Mary L.Rev. 839, 860 (1986), quoting from *Barnette,* 319 U.S. at 642, 63 S.Ct. at 1187. If the government permits people to choose, if it no longer can "force citizens to confess by word or act their faith" in any position, then the government is less able to abet religious intolerance. A government so limited is less likely to be enlisted by particular religious factions. A government so restrained is more civil, less prone to stir up hatreds or give insult to religious minorities. Understanding all of this is an essential step in deciding any constitutional case.

The next and dubious move is to change the level of generality. The consequences of the existing constitutional rule can be made the basis of a generalization in which the Clause deals with *whatever* may reinforce intolerance or give insult to dissenters. This generalization then is reconverted to an absolute rule. It is easy to play this trick on the Establishment Clause. The statement of consequences I have just given can be made a statement of legal rules, such as "Do nothing that will give offense to religious minorities."

The grand generalization could even be read back into the text. We could take "establishment of religion" as "religious establishment"; any church or religious body is an "establishment" in the same way that a tavern is an "establishment". Then the rest of the clause ("Congress shall make no law respecting ...") is read with a modern slant on "respecting". To "respect" a religious establishment is to give it any credence or indicate agreement with (show respect for) that creed. The dictionary admits of at least this much play. See William W. Van Alstyne, *What is "an Establishment of Religion"?,* 65 N.C.L.Rev. 909, 913–16 (1987). This does not contradict any of the other functions of the Clause and so can be taken to reinforce the results of the process of generalization. (The small difficulty is that it condemns as unconstitutional the conduct of the First Congress, President Washington, and the others who contemporaneously with the creation of the first amendment took public stands on religious questions.)

The most difficult task of judging is to identify the appropriate level of generality at which to understand a text, a task that is complicated when the practice at hand was unknown in 1789. See *Ollman v. Evans,* 750 F.2d 970, 995–98 (D.C.Cir.1984) (en banc) (Bork, J., concurring). The appropriate level of generality will be different from text to text. The polar alternative to boundless generality, a narrow minded literalism under which only evils identified in the debates of the 1780s are forbidden, is no more acceptable, for the reasons Judge Bork explained. In selecting the appropriate level of generality, the judge must understand the structure of the document and the kinds of concerns that gave it birth—and the limits attached to the rule being created.

Taking texts at an excessive level of generality denies to authors the ability to influence the understanding of their

choices. One of the most fundamental drafting choices is between a rule and a standard. The rule identifies cases of concern and prescribes outcomes for them. The standard identifies an objective (a value) and transfers to some other body the decisions about how much of that value to achieve. The "reasonableness" requirement of the fourth amendment is a good example of a standard, and the quartering requirement of the third amendment is a good example of a rule. When a text creates a rule, decisions about how much of the end in view to achieve, and at whose expense, have been made by the enacting body; a standard postpones and transfers to others much of that decisionmaking.

Until quite recently the Supreme Court treated the first amendment as a constitutional rule. It generally forbade "balancing"; that had been done by the Framers; indeed the principal function of the amendment was to ensure that Congress did not start balancing things like speech and religion against other social goals. Balancing was employed only to denounce effects on speech of regulations seemingly limited to action. See John Hart Ely, *Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis*, 88 Harv.L.Rev. 1482 (1975). Almost without explanation the speech and religion clauses of the first amendment now are treated as standards. The transmutation of a rule into a standard does more than affect meaning: it changes the identity of the decisionmaker. See also T. Alexander Aleinikoff, *Constitutional Law in the Age of Balancing*, 96 Yale L.J. 943, 966–68, 984–95 (1987).

Most texts are rules, at least within some domain. Their authors choose the objective and how much of it to achieve. That is, they contain both a direction in which to move and a stopping point. No one can pursue the former to the exclusion of the latter without dishonoring an essential part of the enactment. *Rodriguez v. United States*, —— U.S. ——, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987); *In re Erickson*, 815 F.2d 1090, 1094 (7th Cir.1987). Understanding the end in view is an essential ingredient of construing either a rule or a standard, but when a rule is involved the author's objective is only a part of the full analysis: the court also must identify the limits on the achievement of that end. And the court must do this conscious that it is attempting to reconstruct and abide by someone else's decision. When a standard is involved, the court need only make its own best decision.

The migration from rule to standard in constitutional law erodes limits of every kind. It erodes the boundary between legislative and judicial functions, because at a high enough level of generality every constitutional doctrine tells the political branches to select wise policy. It erodes the boundary between past and present, because standards honor the past only to the extent the past transferred decisionmaking authority to someone now living; the keeper of the standard need not honor any other concrete decision of the grantor.

If the Constitution is simply a collection of standards, judges readily can adjust the rules to the times and their circumstances. The price of this, however, is the elimination of rules. The only feature of history that seems to bind is the decision (actually one inferred from the structure of government rather than located in the text) transferring decisionmaking authority to judges. As for the rest, there are only goals and values, which do not bind. The Constitution becomes a general prohibition of evil—as contemporary moral standards identify evil. I for one am "troubled ... by an approach to constitutional interpretation that by watering down a strongly worded clause of the Constitution ... and thickening a watery clause ... homogenizes a diverse text." *Chicago Board of Realtors v. City of Chicago*, 819 F.2d 732, 744 (7th Cir.1987).

The ends Jefferson and Madison pursued are clear now as long ago. They wanted government, state and federal, to have nothing whatever to do with religion, pro or con. They took this view on the basis of considerations of political philosophy that are as powerful today—when theocratic and atheistic states rule much of the world—as they ever were. See, e.g., Jef-

ferson's eloquent *Notes on the State of Virginia* 160 (1784), reprinted in 5 *The Founders' Constitution* 79–80. But Madison did not propose, and the states did not ratify, a text that terminates all intercourse between church and state. The Establishment Clause expunges a certain kind of relationship, an "establishment"—a term with meaning, denoting a relationship characterized by public funding and legal penalties. To say that a broader prohibition would achieve more of the end in view is true but irrelevant, for it assumes away the character of the Establishment Clause as a *rule*—as a text binding judges today just the way it bound the Congress of 1792. We should not drain constitutional terms of meaning in order to create grand generalities that we can imbue with our own elaborations on the purposes or directions these terms imply.

The power of judges to "say what the law is" comes from a belief that there is law to declare. That belief can be sustained only when we honor the limits on the original decisions, for they are every bit as important as the ends in view. To pursue the ends at the expense of the limits is to reject the text we purport to enforce, to make law depend on the will of the interpreter rather than the decision of the author, and to call into question judges' authority to have the final word on debatable issues of public life. When the broader prohibition also sweeps away the practices of the Framers themselves, it is implausible as well as inappropriate. We should not treat them as hypocrites about their own handiwork.

As a legislator or moral philosopher, I would join Madison in thinking that civil authority should not support religion in any way. If this means leaving the celebration of Christmas to the people without the dubious aid of the pasteurized and homogenized religious symbols that appear in civic displays, that will at once strengthen genuine religious resolve and protect the sensibilities of dissenters. But our function is not to pursue Madison's objective as far as it can be pushed, however beneficent that conclusion may be; it is to enforce a text, the limits of which bind us just as

they do the political branches. To the extent the Supreme Court today pursues a different conception of the judicial role under the Establishment Clause, it has yet to justify that conception, which is not congruent with the Court's stated view that it is under the sway of history. Yet for reasons I have spelled out in Part II, even the Court's current understanding of the Establishment Clause does not support the plaintiffs. Chicago may exhibit *all* of the traditional symbols of Christmas during Yuletide.

This case puts political and moral philosophies in conflict with constitutional history and text. In that contest there can be but one winner. I respectfully dissent.