# SUPREME COURT OF THE UNITED STATES

UTAH HIGHWAY PATROL ASSOCIATION

10–1276                 *v.*

AMERICAN ATHEISTS, INC., ET AL.


LANCE DAVENPORT ET AL.

10–1297                 *v.*

AMERICAN ATHEISTS, INC., ET AL.

ON PETITIONS FOR WRITS OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

Nos. 10–1276 and 10–1297.   Decided October 31, 2011

The petitions for writs of certiorari are denied.

JUSTICE THOMAS, dissenting from the denial of certiorari.

Today the Court rejects an opportunity to provide clarity to an Establishment Clause jurisprudence in shambles. A sharply divided Court of Appeals for the Tenth Circuit has declared unconstitutional a private association's efforts to memorialize slain police officers with white roadside crosses, holding that the crosses convey to a reasonable observer that the State of Utah is endorsing Christianity. The Tenth Circuit's opinion is one of the latest in a long line of "'religious display'" decisions that, because of this Court's nebulous Establishment Clause analyses, turn on little more than "judicial predilections."  See *Van Orden* v. *Perry*, 545 U. S. 677, 696, 697 (2005) (THOMAS, J., concurring).  Because our jurisprudence has confounded the lower courts and rendered the constitutionality of displays of religious imagery on government property anyone's guess, I would grant certiorari.

I

The Utah Highway Patrol Association (Association) is a private organization dedicated to supporting Utah High-

way Patrol officers and their families.[1]  In 1998, the Association began commemorating officers who died in the line of duty by placing memorials, in the form of 12- by 6-foot white crosses, at or near locations where the officers were killed.  The fallen officer's name, rank, and badge number are emblazoned across the full length of the horizontal beam of each memorial.  The vertical beam bears the symbol of the Utah Highway Patrol, the year of the officer's death, and a plaque displaying the officer's picture, his biographical information, and details of his death.  To date, the Association has erected 13 cross memorials.

The Association chose the cross because it believed that crosses are used both generally in cemeteries to commemorate the dead and specifically by uniformed services to memorialize those who died in the line of duty.  The Association also believed that only the cross effectively and simultaneously conveyed the messages of death, honor, remembrance, gratitude, sacrifice, and safety that the Association wished to communicate to the public.  Surviving family members of the fallen officers approved each memorial, and no family ever requested that the Association use a symbol other than the cross.

The private Association designed, funded, owns, and maintains the memorials.  To ensure that the memorials would be visible to the public, safe to view, and near the spot of the officers' deaths, the Association requested and received permission from the State of Utah to erect some of the memorials on roadside public rights-of-way, at rest areas, and on the lawn of the Utah Highway Patrol office.  In the permit, the State expressed that it "neither approves or disapproves the memorial marker."  Brief in Opposition 3, n. 3 (internal quotation marks omitted).

Respondents, American Atheists, Inc., and some of its

_____

[1] These cases were decided on a motion for summary judgment. These facts are undisputed.

members, sued several state officials, alleging that the
State violated the Establishment Clause of the First
Amendment, as incorporated by the Fourteenth Amend-
ment, because most of the crosses were on state property
and all of the crosses bore the Utah Highway Patrol's
symbol. The Association, a petitioner along with the state
officials in this Court, intervened to defend the memorials.
The District Court granted summary judgment in favor of
petitioners.

A panel of the Tenth Circuit reversed. As an initial
matter, the panel noted that this Court remains "sharply
divided on the standard governing Establishment Clause
cases." *American Atheists, Inc.* v. *Duncan*, 616 F. 3d 1145,
1156 (2010). The panel therefore looked to Circuit prece-
dent to determine the applicable standard and then ap-
plied the so-called "*Lemon*/endorsement test," which asks
whether the challenged governmental practice has the
actual purpose of endorsing religion or whether it has that
effect from the perspective of a "reasonable observer." *Id.*,
at 1157; see *County of Allegheny* v. *American Civil Lib-
erties Union, Greater Pittsburgh Chapter*, 492 U. S.
573, 592–594 (1989) (modifying the three-pronged test of
*Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), which considered
whether a government action has a secular purpose, has
the primary effect of advancing or inhibiting religion, or
fosters an excessive entanglement between government
and religion). The court concluded that, even though the
cross memorials had a secular purpose, they would none-
theless "convey to a reasonable observer that the state of
Utah is endorsing Christianity." 616 F. 3d, at 1160. This
was so, the court concluded, because a cross is "the
preeminent symbol of Christianity," and the crosses stood
alone, on public land, bearing the Utah Highway Patrol's
emblem. *Ibid.* According to the panel, none of the other
"contextualizing facts" sufficiently reduced the memorials'
message of religious endorsement. *Id.*, at 1161.

The Tenth Circuit denied rehearing en banc, with four judges dissenting.  The dissenters criticized the panel for presuming that the crosses were unconstitutional and then asking whether contextual factors were sufficient to rebut that presumption.  Instead, the dissenters argued, the panel should have considered whether the crosses amounted to an endorsement of religion in the first place in light of their physical characteristics, location near the site of the officer's death, commemorative purpose, selection by surviving family members, and disavowal by the State.  637 F. 3d 1095, 1103–1105 (2010) (opinion of Kelly, J.).  The dissenters also criticized the panel's "unreasonable 'reasonable observer,'" *id.*, at 1104, describing him as "biased, replete with foibles, and prone to mistake," *id.*, at 1108 (opinion of Gorsuch, J.).  Noting that the court "continue[d] to apply (or misapply) a reasonable observer/endorsement test that has come under much recent scrutiny," the dissenters emphasized that the panel's decision was "worthy of review." *Id.*, at 1109–1110 (same).

## II

Unsurprisingly, the Tenth Circuit relied on its own precedent, rather than on any of this Court's cases, when it selected the *Lemon*/endorsement test as its governing analysis.  Our jurisprudence provides no principled basis by which a lower court could discern whether *Lemon*/endorsement, or some other test, should apply in Establishment Clause cases.  Some of our cases have simply ignored the *Lemon* or *Lemon*/endorsement formulations. See, *e.g.*, *Zelman* v. *Simmons-Harris*, 536 U. S. 639 (2002); *Good News Club* v. *Milford Central School*, 533 U. S. 98 (2001); *Marsh* v. *Chambers*, 463 U. S. 783 (1983).  Other decisions have indicated that the *Lemon*/endorsement test is useful, but not binding.  *Lynch* v. *Donnelly*, 465 U. S. 668, 679 (1984) (despite *Lemon*'s usefulness, we are "unwillin[g] to be confined to any single test or criterion in

this sensitive area"); *Hunt* v. *McNair*, 413 U. S. 734, 741 (1973) (*Lemon* provides "no more than helpful signposts"). Most recently, in *Van Orden*, 545 U. S. 677, a majority of the Court declined to apply the *Lemon*/endorsement test in upholding a Ten Commandments monument located on the grounds of a state capitol.[2] Yet in another case decided the same day, *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844, 859–866 (2005), the Court selected the *Lemon*/endorsement test with nary a word of explanation and then declared a display of the Ten Commandments in a courthouse to be unconstitutional. See also *Van Orden, supra,* at 692 (SCALIA, J., concurring) ("I join the opinion of THE CHIEF JUSTICE because I think it accurately reflects our current Establishment Clause jurisprudence—or at least the Establishment Clause jurisprudence we currently apply some of the time"). Thus, the *Lemon*/endorsement test continues to "stal[k] our Establishment Clause jurisprudence" like "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried." *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 398 (1993) (SCALIA, J., concurring in judgment).

Since *Van Orden* and *McCreary*, lower courts have understandably expressed confusion. See *American Civil Liberties Union of Ky.* v. *Mercer Cty.*, 432 F. 3d 624, 636

––––––––––

[2] In *Van Orden*, a plurality determined that the nature of a government display and our Nation's historical traditions should control. 545 U. S., at 686; see also *ibid.* ("Whatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence, we think it not useful in dealing with the sort of passive monument that Texas has erected"). In a concurring opinion, JUSTICE BREYER considered the "basic purposes of the First Amendment's Religion Clauses themselves" rather than "a literal application of any particular test." *Id.*, at 703–704 (opinion concurring in judgment); see also *id.*, at 700 ("[I]n [difficult borderline] cases, I see no test-related substitute for the exercise of legal judgment").

(CA6 2005) (after *McCreary* and *Van Orden*, "we remain in Establishment Clause purgatory").[3] This confusion has caused the Circuits to apply different tests to displays of religious imagery challenged under the Establishment Clause. Some lower courts have continued to apply the *Lemon*/endorsement test.[4] Others have followed *Van*

_____

[3] See also *Green* v. *Haskell Cty. Bd. of Comm'rs*, 574 F. 3d 1235, 1235 n. 1 (CA10 2009) (Kelly, J., dissenting from denial of rehearing en banc) (noting that "[w]hether *Lemon* . . . and its progeny actually create discernable 'tests,' rather than a mere ad hoc patchwork, is debatable" and describing the "judicial morass resulting from the Supreme Court's opinions"); *Card* v. *Everett*, 520 F. 3d 1009, 1016 (CA9 2008) ("Confounded by the ten individual opinions in *[McCreary* and *Van Orden]* . . . courts have described the current state of the law as both 'Establishment Clause purgatory' and 'Limbo'" (citation omitted)); *id.*, at 1023–1024 (Fernandez, J., concurring) (applauding the majority's "heroic attempt to create a new world of useful principle out of the Supreme Court's dark materials" and lamenting the "still stalking *Lemon* test and the other tests and factors, which have floated to the top of this chaotic ocean from time to time," as "so indefinite and unhelpful that Establishment Clause jurisprudence has not become more fathomable" (footnote omitted)); *Skoros* v. *New York*, 437 F. 3d 1, 13 (CA2 2006) ("[W]e confront the challenge of frequently splintered Supreme Court decisions" and Justices who "have rarely agreed—in either analysis or outcome—in distinguishing the permissible from the impermissible public display of symbols having some religious significance"); *Staley* v. *Harris Cty.*, 461 F. 3d 504, 515 (2006), (Smith, J., dissenting) (admonishing the majority for failing to "integrate *McCreary* and *Van Orden* into as coherent a framework as possible"), dism'd as moot on rehearing en banc, 485 F. 3d 305 (CA5 2007).

[4] See *American Civil Liberties Union of Ohio Foundation, Inc.* v. *DeWeese*, 633 F. 3d 424, 431 (CA6 2011) (applying *Lemon*); *Green* v. *Haskell Cty. Bd. of Comm'rs*, 568 F. 3d 784, 797–798, and n. 8 (CA10 2009) ("While the Supreme Court may be free to ignore *Lemon*, this court is not. Therefore, we cannot . . . be guided in our analysis by the *Van Orden* plurality's disregard of the *Lemon* test" (citations and internal quotation marks omitted)); *Skoros*, *supra*, at 17, and n. 13 ("The *Lemon* test has been much criticized over its twenty-five year history. Nevertheless, the Supreme Court has never specifically disavowed *Lemon's* analytic framework. . . . Accordingly, we apply *Lemon*" (citations omitted)); *American Civil Liberties Union of Ky.* v.

*Orden*.[5]   One Circuit, in a case later dismissed as moot, applied both tests.[6]

Respondents assure us that any perceived conflict is "artificial," Brief in Opposition 8, because the lower courts have quite properly applied *Van Orden* to "the distinct class of Ten Commandments cases" indistinguishable from *Van Orden* and have applied the *Lemon*/endorsement test to other religious displays. *Id.*, at 12, 16.   But respondents' "Ten Commandments" rule is nothing more than a thinly veiled attempt to attribute reason and order where none exists.   Respondents offer no principled basis for applying one test to the Ten Commandments and another test to other religious displays that may have similar relevance to our legal and historical traditions.   Indeed, that respondents defend the purportedly uniform application of one Establishment Clause standard to the "Ten Commandments' realm" and another standard to displays of other religious imagery, *id.,* at 16, speaks volumes about the superficiality and irrationality of a jurisprudence meant to assess whether government has made a

--------

*Mercer Cty.*, 432 F. 3d 624, 636 (CA6 2005) ("Because *McCreary County* and *Van Orden* do not instruct otherwise, we must continue to" apply "*Lemon*, including the endorsement test").

[5] See *Card*, *supra*, at 1018 (applying JUSTICE BREYER's concurring opinion in *Van Orden*, which "carv[ed] out an exception" from *Lemon* for certain displays); *ACLU Neb. Foundation* v. *Plattsmouth*, 419 F. 3d 772, 778, n. 8 (CA8 2005) (en banc) ("Taking our cue from Chief Justice Rehnquist's opinion for the Court and Justice Breyer's concurring opinion in *Van Orden*, we do not apply the *Lemon* test"); see also *Trunk* v. *San Diego*, 629 F. 3d 1099, 1107 (CA9 2011) (JUSTICE BREYER's controlling opinion in *Van Orden* "establishes an 'exception' to the *Lemon* test in certain borderline cases," but "we need not resolve the issue of whether *Lemon* or *Van Orden* control" because "both cases guide us to the same result").

[6] See *Staley*, *supra*, at 508–509, and n. 6 (applying *Lemon*/endorsement *and* JUSTICE BREYER's concurrence in *Van Orden* after concluding that the objective observer standard of the endorsement test was "implicit" in JUSTICE BREYER's opinion).

law "respecting an establishment of religion." See *Card* v. *Everett*, 520 F. 3d 1009, 1016 (CA9 2008) (describing "Recent Developments in Ten Commandments Law"). But even assuming that the lower courts uniformly understand *Van Orden* to apply only to those religious displays "factually indistinguishable" from the display in *Van Orden*, Brief in Opposition 16, that understanding conflicts with JUSTICE BREYER's controlling opinion. JUSTICE BREYER's concurrence concluded that there is "no test-related substitute for the exercise of legal judgment" or "exact formula" in "fact-intensive," "difficult borderline cases." 545 U. S., at 700 (opinion concurring in judgment). Nothing in his opinion indicated that only Ten Commandments displays identical to the one in *Van Orden* call for a departure from the *Lemon*/endorsement test.

Moreover, the lower courts have *not* neatly confined *Van Orden* to similar Ten Commandments displays. In *Myers* v. *Loudoun Cty. Public Schools,* 418 F. 3d 395, 402, and n. 8 (2005), the Fourth Circuit applied the *Van Orden* plurality opinion and JUSTICE BREYER's concurring analysis to resolve an Establishment Clause challenge to a statute mandating recitation of the Pledge of Allegiance. In *Staley* v. *Harris Cty.,* 461 F. 3d 504, 511–512 (2006), dism'd as moot on rehearing en banc, 485 F. 3d 305 (2007), the Fifth Circuit applied *Van Orden* to a monument displaying an open bible. And, in *Green* v. *Haskell Cty. Bd. of Comm'rs,* 568 F. 3d 784, 796–797 (2009), the Tenth Circuit applied the *Lemon*/endorsement test to hold unconstitutional a Ten Commandments monument located on the grounds of a public building and surrounded by other secular monuments, facts materially indistinguishable from those in *Van Orden.*

Respondents further suggest that any variation among the Circuits concerning the Establishment Clause standard for displays of religious imagery is merely academic, for much like the traditional *Lemon*/endorsement inquiry,

JUSTICE BREYER's opinion in *Van Orden* considered the "context of the display" and the "message" it communicated. Brief in Opposition 8–12, and n. 5 (internal quotation marks omitted); see *Van Orden*, 545 U. S., at 701–702 (BREYER, J., concurring in judgment); *id.*, at 703 ("For these reasons, I believe that the Texas display . . . might satisfy this Court's more formal Establishment Clause tests"). I do not doubt that a given court could reach the same result under either test. See *ACLU Neb. Foundation* v. *Plattsmouth*, 419 F. 3d 772, 778, n. 8 (CA8 2005) (en banc) (upholding the constitutionality of a display of the Ten Commandments under either standard); *Trunk* v. *San Diego*, 629 F. 3d 1099, 1107, 1125 (CA9 2011) (concluding that the display of a cross was unconstitutional under either standard). The problem is that both tests are so utterly indeterminate that they permit different courts to reach inconsistent results. Compare *Harris* v. *Zion*, 927 F. 2d 1401 (CA7 1991) (applying *Lemon*/endorsement to strike down a city seal bearing a depiction of a cross), with *Murray* v. *Austin*, 947 F. 2d 147 (CA5 1991) (applying *Lemon*/endorsement to uphold a city seal bearing a depiction of a cross); compare also *Plattsmouth, supra* (applying *Van Orden* to uphold a display of the Ten Commandments), with *Staley, supra* (applying *Van Orden* to strike down a display of a Bible). As explained below, it is "the very 'flexibility' of this Court's Establishment Clause precedent" that "leaves it incapable of consistent application." *Van Orden, supra*, at 697 (THOMAS, J., concurring).

## III

In *Allegheny*, a majority of the Court took the view that the endorsement test provides a "sound analytical framework for evaluating governmental use of religious symbols." 492 U. S., at 595 (opinion of Blackmun, J.); *id.,* at 629 (O'Connor, J., concurring in part and concurring in judgment) ("I . . . remain convinced that the endorsement

test is capable of consistent application"). That confidence
was misplaced. Indeed, JUSTICE KENNEDY proved presci-
ent when he observed that the endorsement test amounted
to "unguided examination of marginalia," "using little
more than intuition and a tape measure." *Id.,* at 675–676
(opinion concurring in judgment in part and dissenting
in part).

Since the inception of the endorsement test, we have
learned that a creche displayed on government property
violates the Establishment Clause, except when it doesn't.
Compare *id.,* at 579–581 (opinion of Blackmun, J.) (hold-
ing unconstitutional a solitary creche, surrounded by a
"fence-and-floral frame," bearing a plaque stating "This
Display Donated by the Holy Name Society," and located
in the "main," "most beautiful," and "most public" part of a
county courthouse (internal quotation marks omitted), and
*Smith* v. *County of Albemarle*, 895 F. 2d 953, 955, and n. 2
(CA4 1990) (holding unconstitutional a creche consisting
of "large figures, easily visible, and illuminated at night,"
bearing a disclaimer reading "'Sponsored and maintained
by Charlottesville-Albemarle Jaycees not by Albemarle
County,'" and located on the lawn of a county office build-
ing), with *Lynch,* 465 U. S., at 671 (upholding a creche
displaying 5-inch to 5-foot tall figures of Jesus, Mary,
Joseph, angels, shepherds, kings, and animals, surround-
ed by "a Santa Claus house, reindeer pulling Santa's
sleigh, candy-striped poles, a Christmas tree, carolers,
cutout figures representing such characters as a clown,
an elephant, and a teddy bear, hundreds of colored
lights, [and] a large banner that rea[d] 'SEASONS
GREETINGS,'" situated in a park in the "heart of the
shopping district"), *American Civil Liberties Union of Ky.*
v. *Wilkinson*, 895 F. 2d 1098, 1099, 1104 (CA6 1990) (up-
holding a 15-foot stable "furnished with a manger, two
large pottery jugs, a ladder, railings, and some straw, but
not with the figurines or statues commonly found in a

crèche," bearing a disclaimer stating that "'This display
. . . does not constitute an endorsement by the Common-
wealth of any religion,'" and located on the grounds of the
state capitol, 100 yards from a Christmas tree), and *Elew-
ski* v. *Syracuse*, 123 F. 3d 51, 52 (CA2 1997) (upholding a
solitary creche, raised on a platform "two feet above side-
walk level," containing "statues representing Jesus, Mary,
and Joseph, a shepherd, a donkey, a lamb, and an angel"
holding a banner reading "'Gloria in Excelsis Deo,'" "illu-
minated at night by two forty-watt spotlights" located in a
park on a "major downtown thoroughfare," 300 feet from
a menorah and down the street from secular holiday
symbols).

Likewise, a menorah displayed on government property
violates the Establishment Clause, except when it doesn't.
Compare *Kaplan* v. *Burlington*, 891 F. 2d 1024, 1026, 1030
(CA2 1989) (holding unconstitutional a solitary 16- by 12-
foot menorah, bearing a sign stating "'Happy Chanukah'"
and "'Sponsored by: Lubavitch of Vermont,'" located 60
feet away from City Hall, and "appear[ing] superimposed
upon City Hall" when viewed from "the general direction
of the westerly public street"), with *Allegheny*, supra, at
587, 582 (opinion of Blackmun, J.) (upholding an "18-foot
Chanukah menorah of an abstract tree-and-branch de-
sign," placed next to a 45-foot Christmas tree, bearing a
sign entitled "'Salute to Liberty,'" and located outside of a
city-county building), and *Skoros* v. *New York*, 437 F. 3d 1
(CA2 2006) (upholding school policy permitting display of
menorah along with the Islamic star and crescent, the
Kwanzaa kinara, the Hebrew dreidel, and a Christmas
tree, but prohibiting a creche).

A display of the Ten Commandments on government
property also violates the Establishment Clause, except
when it doesn't. Compare *Green,* 568 F. 3d, at 790 (hold-
ing unconstitutional a monument depicting the Ten Com-
mandments and the Mayflower Compact on the lawn of a

county courthouse, among various secular monuments and personal message bricks, with a sign stating "'Erected by Citizens of Haskell County'"), and *American Civil Liberties Union of Ohio Foundation, Inc.* v. *DeWeese*, 633 F. 3d 424, 435 (CA6 2011) (holding unconstitutional a poster of the Ten Commandments and "seven secular 'Humanist Precepts'" in a courtroom, with "editorial comments" that link religion and secular government), with *Van Orden,* 545 U. S., at 681–682 (plurality opinion) (upholding a monument depicting the Ten Commandments, the Eye of Providence, an eagle, and the American flag and bearing a sign stating that it was "'Presented . . . by the Fraternal Order of Eagles,'" among various secular monuments, on the grounds of a state capitol (some capitalization omitted)), *Card*, 520 F. 3d 1009 (same, on the grounds of old city hall), *Plattsmouth*, 419 F. 3d, at 778, n. 8 (same, in a city park), and *Mercer Cty.,* 432 F. 3d, at 633 (upholding a poster of the Ten Commandments, along with eight other equally sized "American legal documents" and an explanation of the Commandments' historical significance, in a courthouse).

Finally, a cross displayed on government property violates the Establishment Clause, as the Tenth Circuit held here, except when it doesn't. Compare *Friedman* v. *Board of Cty., Comm'rs of Bernalillo Cty.*, 781 F. 2d 777, 779 (CA10 1985) (holding unconstitutional a county seal displaying a Latin cross, "highlighted by white edging and a blaze of golden light," under the motto "'With This We Conquer'" written in Spanish), *Harris*, 927 F. 2d, at 1404 (holding unconstitutional one city seal displaying a cross on a shield, surrounded by a dove, crown, scepter, and a banner proclaiming "'God Reigns,'" and another city seal displaying a cross surrounded by a one-story building, a water tower, two industrial buildings, and a leaf), and *Trunk*, 629 F. 3d 1099 (holding unconstitutional a 29- by 12-foot cross atop a 14-foot high base on the top of a hill,

surrounded by thousands of stone plaques honoring military personnel and the American flag), with *Murray*, 947 F. 2d 147 (upholding a Latin cross, surrounded by a pair of wings, in a city insignia), and *Weinbaum* v. *Las Cruces*, 541 F. 3d 1017, 1025 (CA10 2008) (upholding "three interlocking crosses," with a white, slightly taller center cross, surrounded by a sun symbol, in a city insignia, as well as a cross sculpture outside of a city sports complex and a mural of crosses on an elementary school wall). See also *Salazar* v. *Buono*, 559 U. S. ___, ___ (2010) (plurality opinion) (slip op., at 14–15) ("A cross by the side of a public highway marking, for instance, the place where a state trooper perished need not be taken as a statement of governmental support for sectarian beliefs").

One might be forgiven for failing to discern a workable principle that explains these wildly divergent outcomes. Such arbitrariness is the product of an Establishment Clause jurisprudence that does nothing to constrain judicial discretion, but instead asks, based on terms like "context" and "message," whether a hypothetical reasonable observer of a religious display could think that the government has made a law "respecting an establishment of religion."[7] Whether a given court's hypothetical observer will be "*any* beholder (no matter how unknowledgeable), or the *average* beholder, or . . . the 'ultra-reasonable' beholder," *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 769, n. 3 (1995) (plurality opinion), is en-

———————

[7] That a violation of the Establishment Clause turns on an observer's potentially mistaken belief that the government has violated the Constitution, rather than on whether the government has *in fact* done so, is perhaps the best evidence that our Establishment Clause jurisprudence has gone hopelessly awry. See *McCreary County* v. *American Civil Liberties Union of Ky.,* 545 U. S. 844, 901 (2005) (SCALIA, J., dissenting) (describing the "oddity" that "the legitimacy of a government action with a wholly secular effect would turn on the *misperception* of an imaginary observer").

tirely unpredictable. Indeed, the Tenth Circuit stated below that its observer, although not "omniscient," would "know far more than most actual members of a given community," and then unhelpfully concluded that "[h]ow much information we will impute to a reasonable observer is unclear." 616 F. 3d, at 1159 (internal quotation marks omitted). But even assuming that courts could employ observers of similar insight and eyesight, it is "unrealistic to expect different judges . . . to reach consistent answers as to what any beholder, the average beholder, or the ultrareasonable beholder (as the case may be) would think." *Pinette*, *supra*, at 769, n. 3.

## IV

It comes as no surprise, then, that despite other cases holding that the combination of a Latin cross and a public insignia on public property does not convey a message of religious endorsement, see *Murray, supra*; *Weinbaum, supra*, the Tenth Circuit held otherwise. And, of course, the Tenth Circuit divided over what, exactly, a reasonable observer would think about the Association's memorial cross program.

First, the members of the court disagreed as to what a reasonable observer would *see*. According to the panel, because the observer would be "driving by one of the memorial crosses at 55-plus miles per hour," he would not see the fallen officer's biographical information, but he would see that the "cross conspicuously bears the imprimatur of a state entity . . . and is found primarily on public land." 616 F. 3d, at 1160. According to the dissenters, on the other hand, if the traveling observer could see the police insignia on the cross, he should also see the much larger name, rank, and badge number of the fallen officer emblazoned above it. 637 F. 3d, at 1108–1109 (opinion of Gorsuch, J.); *id.*, at 1104 (opinion of Kelly, J.). The dissenters would also have employed an observer who was able to

pull over and view the crosses more thoroughly and would have allowed their observer to view four of the memorials located on side-streets with lower speed limits. *Id.*, at 1109 (opinion of Gorsuch, J.).

Next, the members of the court disagreed about what a reasonable observer would *feel*. The panel worried that the use of a Christian symbol to memorialize fallen officers would cause the observer to think the Utah Highway Patrol and Christianity had "some connection," leading him to "fear that Christians are likely to receive preferential treatment from the [patrol]—both in their hiring practices and, more generally, in the treatment that people may expect to receive on Utah's highways." 616 F. 3d, at 1160. The dissenters' reasonable observer, however, would not take such a "paranoid," "conspiratorial view of life," "conjur[ing] up fears of religious discrimination" by a "'Christian police,'" especially in light of the more plausible explanation that the crosses were simply memorials. 637 F. 3d, at 1105 (opinion of Kelly, J.). The panel also emphasized that the "massive size" of these crosses would heighten the reasonable observer's fear of discrimination and proselytization, unlike the "more humble spirit of small roadside crosses." 616 F. 3d, at 1161–1162. The dissenters, by contrast, insisted that the size of the crosses was necessary to ensure that the reasonable observer would "take notice of the display and absorb its message" of remembrance and to ensure that the crosses could contain all of the secular facts necessary to assuage the reasonable observer's fears. 637 F. 3d, at 1105–1106 (opinion of Kelly, J.).

Finally, the members of the court disputed what the reasonable observer would *know*. The panel acknowledged that the reasonable observer would recognize that the crosses commemorated death, but he would see only that the symbol "memorializes the death of a *Christian*." 616 F. 3d, at 1161. That the designers of the cross memorials

were Mormons, or that Christians who revere the cross are a minority in Utah, would have no effect on him. *Id.,* at 1163–1164. Conversely, the dissenters' reasonable observer would have known that the crosses were chosen by the fallen officer's family and erected by a private group without design approval from the State, and that most Utahns do not revere the cross.[8]  637 F. 3d, at 1110 (opinion of Gorsuch, J.); *id.*, at 1105 (opinion of Kelly, J.).

To any truly "reasonable observer," these lines of disagreement may seem arbitrary at best. But to be fair to the Tenth Circuit, it is our Establishment Clause jurisprudence that invites this type of erratic, selective analysis of the constitutionality of religious imagery on government property. These cases thus illustrate why "[t]he outcome of constitutional cases ought to rest on firmer grounds than the personal preferences of judges." *Van Orden*, 545 U. S., at 697 (THOMAS, J., concurring).

V

Even if the Court does not share my view that the Establishment Clause restrains only the Federal Government, and that, even if incorporated, the Clause only prohibits "'actual legal coercion,'" see *id.*, at 693, the Court should be deeply troubled by what its Establishment Clause jurisprudence has wrought. Indeed, five sitting Justices have questioned or decried the *Lemon*/ endorsement test's continued use. *Salazar*, 559 U. S., at ___–___ (plurality opinion of KENNEDY, J., joined in full by ROBERTS, C. J., and in part by ALITO, J.) (slip op., at 15–18) (emphasizing criticism of the endorsement test and

_____

[8] According to the statement of undisputed facts before the District Court, approximately 57 percent of Utahns are members of the Church of Jesus Christ of Latter-day Saints. Neither the Church nor its members use the cross as a symbol of their religion or in their religious practices. *American Atheists, Inc.* v. *Duncan*, 528 F. Supp. 2d 1245, 1249 (Utah 2007).

its workability); *id.*, at ___ (ALITO, J., concurring in part
and concurring in judgment) (slip op., at 6) ("Assuming
that it is appropriate to apply the so-called 'endorsement
test,' this test would not be violated [here]"); *Pinette*, 515
U. S., at 768, n. 3 (plurality opinion of SCALIA, J.) (The
endorsement test "supplies no standard whatsoever"); *Van
Orden*, *supra*, at 692–693 (THOMAS, J., concurring) ("This
case would be easy if the Court were willing to abandon
the inconsistent guideposts it has adopted for addressing
Establishment Clause challenges," citing, *inter alia*, the
*Lemon* and endorsement tests); *Allegheny*, 492 U. S., at
669 (KENNEDY, J., concurring in judgment in part and
dissenting in part) ("[T]he endorsement test is flawed in
its fundamentals and unworkable in practice"); see also
*McCreary County*, 545 U. S., at 890 (2005) (SCALIA, J.,
joined in full by Rehnquist, C. J., and THOMAS, J., and in
part by KENNEDY, J., dissenting) ("[A] majority of the
Justices on the current Court . . . have, in separate opin-
ions, repudiated the brain-spun '*Lemon* test'").

　And yet, six years after *Van Orden*, our Establishment
Clause precedents remain impenetrable, and the lower
courts' decisions—including the Tenth Circuit's decision
below—remain incapable of coherent explanation.　It is
difficult to imagine an area of the law more in need of
clarity, as the 46 *amici curiae* who filed briefs in support
of certiorari confirm.　Respondents tell us there is no
reason to think that a case with facts similar to this one
will recur, Brief in Opposition 17, but if that counsels
against certiorari here, this Court will never again hear
another case involving an Establishment Clause challenge
to a religious display.　It is *this* Court's precedent that has
rendered even the most minute aesthetic details of a
religious display relevant to the constitutional question.
We should not now abdicate our responsibility to clean up
our mess because these disputes, by our own making, are

"factbound."[9]    This suit, which squarely implicates the viability and application of the *Lemon*/endorsement test,[10] is as ripe a suit for certiorari as any.[11]

---

[9] In any event, respondents' incredible assertion is belied by the fact that, two days after respondents filed their brief in opposition to certiorari in our Court, respondents sued the Port Authority of New York City and demanded removal of a cross located at Ground Zero. See *Complaint in American Atheists, Inc.* v. *Port Auth. of New York,* No. 108670–2011 (N. Y. Sup. Ct.); Notice of Removal in *American Atheists, Inc.* v. *Port Auth. of New York,* No. 1:11–cv–06026 (SDNY).

[10] That the petition of the Association presents the question whether the cross memorials in this suit are government speech is no obstacle to certiorari. The Court need not grant certiorari on that question, and the state petitioners only ask this Court to resolve the viability and application of the endorsement test.

[11] Respondents argue that this suit would be a poor vehicle to explore the contours of a coercion-based Establishment Clause test because the State has raised the specter of a preference for one religion over others. In this regard, respondents point out that the State took the position before the lower courts that it would not be able to approve the Association's memorials "'in the same manner'" if the Association, as it indicated it would, allowed an officer's family to request a symbol other than a cross. Brief in Opposition 3–4, 31.

Because no such situation has ever arisen, and because the State has only indicated it could not approve a different marker *in the same manner* as the roadside crosses, respondents distort the record by claiming that the State has put families to the choice of "a Latin cross or no roadside memorial at all." *Id.,* at 4. Moreover, it is undisputed that the State's position stemmed from its belief that "if [the Association] were to change the shape of the memorial to reflect the religious symbol of the fallen trooper, rather than the shape of the cross, the memorial would no longer be a *secular* shape recognized as a symbol of death." App. to Brief in Opposition 9a–15a (emphasis added). That position is entirely consistent with the Tenth Circuit's conclusion that the purposes of the State and Association in permitting and implementing the memorial program were secular. In any event, that the State and Association, both defending the memorial program's constitutionality, took conflicting positions about whether it was impermissibly religious to use only crosses, or impermissibly religious to use other symbols reflective of the deceased's religious preference, only highlights the confusion surrounding the Establishment Clause's requirements.

\*    \*    \*

Concurring in *Allegheny*, JUSTICE O'CONNOR wrote that "the courts have made case-specific examinations" of government actions in order to *avoid* "sweep[ing] away all government recognition and acknowledgment of the role of religion in the lives of our citizens." 492 U. S., at 623 (opinion concurring in part and concurring in judgment). But that is precisely the effect of this Court's repeated failure to apply the correct standard—or at least a clear, workable standard—for adjudicating challenges to government action under the Establishment Clause. Government officials, not to mention everyday people who wish to celebrate or commemorate an occasion with a public display that contains religious elements, cannot afford to guess whether a federal court, applying our "jurisprudence of minutiae," *id.*, at 674 (KENNEDY, J., concurring in judgment in part and dissenting in part), will conclude that a given display is sufficiently secular. The safer course will be to "purge from the public sphere all that in any way partakes of the religious." *Van Orden*, 545 U. S., at 699 (BREYER, J., concurring in judgment). Because "the Establishment Clause does not compel" that result, *ibid.*, I would grant certiorari.