POSNER, Circuit Judge,
dissenting.
I don’t agree that by choosing — and not for religious reasons — to conduct its graduation ceremony in a church, a public high school transgresses the command in the First Amendment that “Congress [and by interpretation of the Fourteenth Amendment state governments as well] shall make no law respecting an establishment of religion.” (Actually two schools are involved, both located in Brookfield, Wisconsin, but for the sake of simplicity I’ll pretend they’re one and call it Brookfield High.)
The case law that the Supreme Court has heaped on the defenseless text of the establishment clause is widely acknowledged, even by some Supreme Court Justices, to be formless, unanchored, subjecfive and provide no guidance. See, e.g., Utah Highway Patrol Ass’n v. American Atheists, Inc., — U.S.-, 132 S.Ct. 12, 181 L.Ed.2d 379 (2011) (dissent from denial of certiorari) (“Establishment Clause jurisprudence [is] in shambles,” “nebulous,” “erratic,” “no principled basis,” “Establishment Clause purgatory,” “impenetrable,” “ad hoc patchwork,” “limbo,” “incapable of consistent application,” “our mess,” “little more than intuition and a tape measure”); Lamb’s Chapel v. Center Moriches Union Free School District, 508 U.S. 384, 398-99, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (concurring opinion) (a “geometry of crooked lines and wavering shapes,” a “ghoul in a late night horror movie” that can’t be slain even though “no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature’s heart”).
The text and history of the establishment clause provide no clue to whether a public high school (a virtually nonexistent institution in the eighteenth century) “establishes” religion when it holds its graduation ceremony in a church. The opaque phrase “respecting an establishment” easts no light on the question. The phrase may have been substituted for “establishing” so that the federal government would be forbidden not only to create an established church but also to disestablish New England’s quasi-established churches. See, *873 e.g., Kent Greenawalt, “Common Sense about Original and Subsequent Understandings of the Religion Clauses,” 8 U. Pa. J. Const’l L. 479, 484-85 (2006). But Noah Feldman, “The Intellectual Origins of the Establishment Clause,” 77 NYU L.Rev. 346, 405-08 (2002), presents a powerful argument against the second half of this interpretation.
It’s no help to the cause of constitutional interpretation that religion is an emotional subject and that there is no systematic evidence of the social, political, psychological, cultural, ethical, or indeed religious consequences of the display of religious symbols in today’s United States. Here as elsewhere evidence-based law remains a dream. The Supreme Court’s effort to marshal some evidence in Lee v. Weisman, 505 U.S. 577, 593-94, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), was a flop, as pointed out in Donald N. Bersoff & David J. Glass, “The Not-So Weisman: The Supreme Court’s Continuing Misuse of Social Science Research,” 2 U. Chi. L. Sch. Roundtable 279, 288-93 and n. 95 (1995). With no guidance from the Constitution or the social sciences, judges inevitably fall back on their priors, that is, on beliefs based on personality, upbringing, conviction, experience, emotions, and so forth that people bring to a question they can’t answer by the methods of logic and science or some other objective method. A judge’s political orientation is a particularly important clue to his or her likely vote in a case arising under the religion clauses of the First Amendment; conservative judges are more favorable to religion in their decisions than liberal ones, though only on average rather than in every case. Michael Heise & Gregory C. Sisk, “Religion, Schools, and Judicial Decision Making: An Empirical Perspective,” 79 U. Chi. L.Rev. 187 (2012); Gregory C. Sisk & Michael Heise, “Ideology ‘All the Way Down’? An Empirical Study of Establishment Clause Decisions in the Federal Courts,” 110 Mich. L.Rev. 1201 (2012).
The best that a judge of determined neutrality faced with a case such as the present one can do is to be guided by Gibbon’s aphorism (from chapter 2 of the Decline and Fall) that “the various modes of worship, which prevailed in the Roman world, were all considered by the people, as equally true; by the philosopher, as equally false; and by the magistrate, as equally useful.” For “the Roman world” substitute “the United States” and for “the magistrate” substitute “the judge” and one has the right starting point for the analysis of this case. The judge should not be concerned with the truth or falsity of any religious faith but should regard the various faiths as “equally useful” from the standpoint of society, in recognition of the importance that Americans attach to religion, the diversity and intensity of their religious beliefs and observances, and the bitterness and strife that the government’s taking sides among competing faiths would engender. One can certainly agree with the Supreme Court that “all creeds must be tolerated and none favored.” Lee v. Weisman, supra, 505 U.S. at 589-90, 112 S.Ct. 2649; see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532-33, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); Everson v. Board of Education, 330 U.S. 1, 15-16, 67 S.Ct. 504, 91 L.Ed. 711 (1947). And for this purpose atheism (in ancient Rome the philosophers’ creed) is a religious creed.
Elmbrook Church is a huge church (a “megachurch”) self-described as “a nondenominational, evangelical Christian church that welcomes people of all backgrounds. We believe that God loves all people and that His word, the Bible, has practical spiritual guidance for every life situation.” “About Elmbrook,” www. elmbrook.org/about-elmbrook/ (visited July *874 10, 2012). The students at Brookfield High overwhelmingly and emphatically deemed the school’s gym an inadequate venue for the graduation ceremony. Yet it was the only possible one on the school’s grounds (apart from the football field, also deemed inadequate — the students wanted to be indoors with air conditioning). Bowing to their wishes the school chose Elm-brook Church, the students’ first choice. The plaintiffs do not argue that the choice was motivated by religious considerations even though the school district’s superintendent attends it. Nor do they deny that purely secular considerations, such as seating capacity, comfort, location, and price, may well have made the church the best alternative to the school’s gym.
The graduation, though held in the church’s auditorium (a designation that the church uses interchangeably with “sanctuary”), where religious services are held on Sunday, is conducted by school officials rather than by church officials and is entirely secular. It is the same ceremony that would have been conducted in the school’s gym had graduations been held there.
The auditorium is dominated by a huge cross on the front wall, facing the pews. Religious banners festoon the interior walls and proselytizing pamphlets are within easy reach of persons seated in the pews and walking through the lobby. At at least one graduation the lobby’s religious-information booths were staffed. And at that or another graduation church members passed out religious literature to the audience. But there is no evidence that school officials endorsed or encouraged this or any other religious activity during the graduation. This distinguishes the two cases on which the plaintiffs mainly rely, both of which involved school-sanctioned prayer at public school events. In Santa Fe Independent School District v. Doe, 530 U.S. 290, 305, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), the Supreme Court termed such prayer an “actual endorsement of religion” — “a public expression of the views of the majority of the student body delivered with the approval of the school administration.” And in Lee v. Weisman, supra, 505 U.S. at 588, 112 S.Ct. 2649, it termed such prayer “an overt religious exercise in a secondary school environment.”
Religious decor would be inappropriate in a public school classroom — it would signal an “actual endorsement of religion.” But the auditorium of Elmbrook Church is no more a classroom than the National Cathedral in Washington is when public school students are taken on a tour of it. Nor is this a case in which a public school district, pleading poverty, sells its schools and rents a church building in which to hold classes; again the appearance of endorsement would be inescapable. The difference between a public school’s using a church two or three hours a year and its using it a thousand-odd hours a year is one of degree rather than of kind, but differences of degree are inescapable grounds of legal distinctions. “I am the last man in the world to quarrel with a distinction simply because it is one of degree. Most distinctions, in my opinion, are of that sort, and are none the worse for it.” Haddock v. Haddock, 201 U.S. 562, 631, 26 S.Ct. 525, 50 L.Ed. 867 (1906) (Holmes, J., dissenting). “Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind.” Welch v. Helvering, 290 U.S. 111, 114, 54 S.Ct. 8, 78 L.Ed. 212 (1933) (Cardozo, J.).
It will not do to equate school activity at a church to church activities at a public school. The religion-in-school cases, such as Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam), *875 cited by the majority, held that the establishment clause had been violated because the government was trying to induce kids to engage in religious activity, and that isn’t alleged in our case.
The plaintiffs argue that by picking a church for graduation ceremonies, the school, even if unintentionally, was aiding religion in general and the church’s sect (Evangelical Protestantism) in particular, and that any governmental aid to religion is unconstitutional. But by this token providing police and fire protection for churches is unconstitutional, along with exempting them (as not-for-profit institutions) from property taxes, an exemption upheld against a challenge based on the establishment clause in Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). And by that same token a government agency’s buying Gewürztraminer produced at the Klosterneuburg Monastery in Austria, Slivovitz produced at the Troyan Monastery in Bulgaria, or Chimay produced by Trappist monks, is unconstitutional, as placing a stamp of government approval on a religious product.
True, in these instances the government is simply treating religious property owners like their closest secular counterparts. But the same is true of allowing them to rent space to government enterprises, such as public schools. Churches typically are fully utilized on only one day of the week (apart from religious holidays), and private organizations that have unused space often rent the space to public as well as private bodies. Among these organizations are churches, which commonly rent space to government for polling places in elections — a practice the courts have upheld, Otero v. State Election Board, 975 F.2d 738, 740-41 (10th Cir.1992); see also Berman v. Board of Elections, 420 F.2d 684 (2d Cir.1969) (per curiam), even though it puts the prospective voter to a choice between entering a church and giving up his right to vote, unless permitted to vote by absentee ballot. One church, and it is doubtless not alone, “has permitted others to use its facilities for non-religious purposes over the years, including for polling stations, government food distribution programs, town meetings, Alcoholics Anonymous meetings, Harvest Festival activities, water department meetings, and a senior lunch program.” Guatay Christian Fellowship v. County of San Diego, 670 F.3d 957, 962 (9th Cir.2011).
But could it be that the cross and the banners and other religious paraphernalia visible to occupants of the auditorium of the Elmbrook Church would predispose attendants at the graduation to join the church, thus giving the evangelical sect that owns it a competitive advantage? And might not the conferral of such an advantage be thought a form of establishment? But the plaintiffs find the church offensive, and are thus in no danger of being converted. There is no suggestion that holding a high-school graduation at the Elmbrook Church has ever triggered a conversion.
How often are visitors to churches converted by the visit? Conversion generally precedes attendance. How many of the millions of non-Catholic visitors to St. Peter’s — Protestants, Jews, Muslims, Hindus, Buddhists, atheists, and so forth — have converted to Catholicism as a result of their visit to that awesome site? I mean no disrespect to the Elmbrook Church in pointing out that no counterpart to the treasures of St. Peter’s that include Bernini’s baldacchino and Michelangelo’s Pieta, the tombs of 91 Popes, a fragment of the True Cross, and the spear that pierced Christ’s side at the Crucifixion (of course the authenticity of the last two items has been questioned), is to be found there.
*876 The plaintiffs argue that by holding its graduation ceremony in a church festooned with religious symbols, Brookfield High is “coercing students and parents to attend a house of worship.” “Coercing?” That is hyperbole. Attendance at graduation isn’t compulsory, graduation is not a “coerced activity,” and a student who attends graduation in Elmbrook Church no more attends a religious ceremony than the cleaning crew when it sweeps the church’s aisles. When the Supreme Court said in Lee v. Weisman, supra, 505 U.S. at 586, 595, 112 S.Ct. 2649, in florid hyperbole that “attendance and participation in the [graduation ceremony] are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma,” as “it is apparent that a student is not free to absent herself from the graduation exercise in any real sense of the term ‘voluntary,’ for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years,” it was whistling in the dark.
The plaintiffs say the church is “using its control over the environment of the graduation ceremonies to expose thousands of attendees per year — including numerous youths — to its religious message.” There is nothing to suggest that the church enhances the religiosity of its interior decor for the graduation. The interior is what it is. A church that rents space to a secular organization shouldn’t be required to pretend it isn’t a church.
The reductio ad absurdum is the plaintiffs’ complaint, as unrealistic about the modern American high schooler as the Supreme Court in Lee v. Weisman, that when the students sit down in the church pews for the graduation ceremony, church literature visible to them in the book racks on the backs of the pews in front of them tells them they’re “God’s Little Lambs,” and thoughtfully provides them with a “Scribble Card for God’s Little Lambs” and a pencil to scribble with, and thus tries to seduce them to Evangelical Protestantism. Imagine how 18-year-olds react to being called little lambs! True, the family members who attend the graduation may include children, but in no sense are they coerced by the school to attend the graduation.
The idea that mere exposure to religious imagery, with no accompanying proselytizing, is a form of religious establishment has no factual support, as well as being implausible. Religion is for good or ill a large component of human culture, including American culture. Religious words and symbols are ubiquitous. I have heard oral argument in this court on more than a thousand occasions, and every session has begun with a member of the court’s staff intoning “God save the United States and this honorable court.” Should this outcry, or the religious paintings in the National Gallery in Washington (another federal facility), seen over time by millions, be considered an establishment of religion? Does it send trial lawyers running to the baptismal font? The court crier’s phrase, if thought anything other than a fossil trace of a more unself-conseiously Christian era in the nation’s history, can’t be interpreted as anything other than a governmental expression of belief in one God who influences the fortunes of our nation and may even if properly appealed to protect the United States Court of Appeals for the Seventh Circuit. It is explicitly religious, but it is also innocuous.
The interior of the Elmbrook Church, perhaps the very idea of a church, offends the plaintiffs. But offense can’t be the criterion for an establishment of religion; if it were, no challenge based on the establishment clause would ever fail, for those challenges are invariably mounted by peo *877 pie offended by the government’s association with religion. So performance of a blasphemous play in a public university’s theater, upheld in Linnemeir v. Board of Trustees of Purdue University, 260 F.3d 757 (7th Cir.2001), would be held to violate the establishment clause by associating government with antireligious expression that offends devout Christians. Hypersensitivity is not a First Amendment principle.
But de minimis non curat lex is. Brandt v. Board of Education, 480 F.Sd 460, 465 (7th Cir.2007), citing Ingraham v. Wright, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). As the Supreme Court has explained, “The First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow.” Lee v. Weisman, supra, 505 U.S. at 598, 112 S.Ct. 2649, quoting School District of Abington Township v. Schempp, 374 U.S. 203, 308, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (concurring opinion). This is a bit of common sense to set against the Court’s ode to high school graduation.
The likely effects of today’s decision will be, first, to confirm the view of many religious Americans that the courts are hostile to religion; second, to infuriate students and their families by depriving them of the best site for their high school graduation (the school district in this case has built a new building that will house future graduation ceremonies, but any other public schools in the Seventh Circuit that hold their graduation ceremonies in churches will have to scramble for alternative sites); and third, to initiate what federal law does not need: a jurisprudence of permissible versus impermissible rentals of church space to public schools and other public entities. The majority opinion leaves open the possibility that if the high school burned down and the church were the only feasible site for holding classes while the school was out of commission, such a public use of religious property would be permissible. An emergency exception to the rule laid down today is appropriate, but the list of exceptions won’t end there. What if the school didn’t burn down but only the gym, and what if, thinking their principal competitor, Elmbrook Church, had been eliminated from consideration as the substitute venue for the graduation, the owners of alternative venues raised their rental price and the church responded by lowering its price? Could the high school then, in this period of diminished public school budgets, plead economic necessity for continuing to hold its graduation ceremony in the church?
And what if Elmbrook Church were not Evangelical — were instead a New England Congregational church, which often has no cross on the outside and meager religious imagery inside; for there is an iconoclastic streak in Protestantism, though not in Elmbrook Church any more than in the great Anglican cathedrals. Would that change the outcome of this case? The majority, having stated at the outset that the case must be decided by reference to “the set of facts before us” (though its conception of facts is not mine: I don’t think such statements as “endorsement is intrinsically coercive” are factual, or even meaningful) and not on the basis of a rule, emphasizes what the fastidious might regard as the overblown character of the Elmbrook Church’s religious imagery, in concluding that a public school cannot hold *878 a graduation there. The opinion provides a virtual inventory of the religious objects in the church. If such details of a church’s interior thus have dispositive constitutional significance, we shall in future cases have to assess the iconography of the churches that compete to rent space to a school or other public body, including an election board. (On the majority’s view, could the auditorium of Elmbrook Church be used as a polling place? Since 18-year-olds have a constitutional right to vote, many voters are no older than graduating high school seniors.) All other objections to one side, a jurisprudence of church furnishings (“requiring scrutiny more commonly associated with interior decorators than with the judiciary,” American Jewish Congress v. City of Chicago, 827 F.2d 120, 129 (7th Cir.1987) (dissenting opinion)), inevitably favoring iconoclastic churches, would be inconsistent with governmental neutrality among sects.
And finally, returning to an earlier point, isn’t it about time that constitutional cases were decided on the basis of evidence rather than conjecture (“everyone knows”) and doubtless in many cases bias? Is there any evidence, as distinct from conjecture and intuition, that the exposure of high school students to the interior of a church — any church — has any effect on religious beliefs or observances? The great David Hume favored established churches on the ground that monopoly breeds indolence, and so an established church would dampen religious strife. Until the Schempp decision in 1963 prayer was common in public schools in many parts of this country, yet religion had less salience in the public sphere than it has today. Separation rulings by the Supreme Court seem only to stimulate religious fervor. Religions thrive on persecution, real or imagined. Where would Christianity be without its martyrs? The real winner of this case is likely to be — Elmbrook Church.